# 22-2537-cv(L)

## 22-2685-cv(CON), 22-2701-cv(CON)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

❯❯ ❮❮

GOVERNMENT EMPLOYEES INSURANCE COMPANY, GEICO INDEMNITY COMPANY, GEICO GENERAL INSURANCE COMPANY, GEICO CASUALTY COMPANY,

*Plaintiffs-Appellees,*

*v.*

IGOR MAYZENBERG, MINGMEN ACUPUNCTURE, P.C., SANLI ACUPUNCTURE, P.C., LAOGONG ACUPUNCTURE, P.C., TAMILLA DOVMAN, AKA TAMILLA KHANUKAYEV, IGOR DOVMAN,

*Defendants-Appellants,*

*and*

JOHN DOE,

*Defendant.*

————————————

*On Appeal from the United States District Court for the Eastern District of New York*

**BRIEF AND SPECIAL APPENDIX FOR DEFENDANTS-APPELLANTS IGOR MAYZENBERG, MINGMEN ACUPUNCTURE, P.C., SANLI ACUPUNCTURE, P.C., AND LAOGONG ACUPUNCTURE, P.C.**

SCHWARTZ, CONROY & HACK, PC
*Attorneys for Defendants-Appellants
  Igor Mayzenberg, Mingmen Acupuncture, P.C.,
  Sanli Acupuncture, P.C.,
  and Laogong Acupuncture, P.C.*
666 Old Country Road, 9th Floor
Garden City, New York 11530
516-745-1122

## <u>TABLE OF CONTENTS</u>

CORPORATE DISCLOSURE STATEMENT…………………………………1

INTRODUCTION………………………………………………………………….2

STATEMENT OF JURISDICTION……...………………………………….. 6

STATEMENT OF THE ISSUES………………………………………… 7

STATEMENT OF THE CASE…………………………………………… 8

SUMMARY OF THE ARGUMENT………………………………….. 14

STANDARD OF REVIEW…………………………………………… 16

ARGUMENT …………………………………………………………… 17

      A. Summary Judgment Standard………………………………… 17

      B. The No-Fault Statutory Framework in New York…………….. 19

      C. Defendants are Entitled to Judgment as a Matter of Law on the
          Issue of Kickbacks………………………………………….. 22

          (a) Kickbacks Cannot Be a Basis for GEICO Not Paying
              Medical Services Rendered by Mayzenberg Defendants
              or Recouping Payments Already Made………………………22

          (b) Even if Proof of Kickbacks for Referrals Would Be a
              Reason to Deny Payment, GEICO Failed to Demonstrate
              Any Kickbacks for Referrals Actually Occurred Here………26

      D. The Alleged Fraudulent Treatment Protocol………………….. 30

      E. GEICO's CLAIMS ARE UNSUPPORTABLE……………… 32

          (a) Civil Rico [1962 (c) & (d)]………………………………… 32

(b) Common Law Fraud…………………………………………….. 34

(c) Unjust Enrichment…………………………………………….. 35

CONCLUSION…………………………………………………….. 36

CERTIFICATE OF COMPLIANCE……………………………………… 37

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page**

*Allstate Ins. Co. v. Williams,*
2015 WL 5560543, at *7 (E.D.N.Y. Aug. 28, 2015)………………… 21

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)……. 17

*Boyle v. United States*,
556 U.S. 938, 946, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009)……….. 33

*Cedric Kushner Promotions, Ltd. v. King*,
533 U.S. 158, 161, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001)………… 33

*Celotex Corp. v. Catrett,*
477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)………… 17

*Central Gen. Hosp. v. Chubb Group of Ins. Companies*,
90 N.Y.2d 195, 199, 659 N.Y.S.2d 246, 681 N.E.2d 413 (1997)…….. 20

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.*,
187 F.3d 229, 242 (2d Cir. 1999)…………………………………… 32

*Cohen v. Houseconnect Realty Corp.,*
289 A.D.2d 277, 278, 734 N.Y.S.2d 205 (N.Y.App.Div.2001)……… 34

*Crigger v. Fahnestock & Co.,*
443 F.3d 230, 234 (2d Cir.2006)………………………………….. 34

*Dolmetta v. Uintah Nat'l Corp.,*
712 F.2d 15, 20 (2d Cir.1983))…………………………………… 35

*Fair Price Medical Supply Corp. v. Travelers Indem. Co.*,
10 N.Y.3d 556, 860 N.Y.S.2d 471, 890 N.E.2d 233 (2008)………… 20

*Government Employees Ins. Co. v. AMD Chiropractic, P.C.*,
2013 WL 5131057, at *8 (E.D.N.Y. Sept. 12, 2013)………………… 21

iii

*Government Employees Ins. Co. v. Jacques*,
2017 WL 9487191, at \*9-\*11 (E.D.N.Y. Feb. 13, 2017),
*report and recommendation adopted*, 2017 WL 1214460
(E.D.N.Y. Mar. 31, 2017)…..……………………………………… 21

*Kaye v. Grossman,*
202 F.3d 611, 616 (2d Cir.2000)……………………………………… 35

*McBride v. BIC Consumer Prod. Mfg. Co., Inc.,*
583 F.3d 92, 96 (2d Cir. 2009)……………………………………… 16

*Medical Society of State v. Serio*,
100 N.Y.2d 854, 860, 768 N.Y.S.2d 423,800 N.E.2d 728
(N.Y. 2003)…………………………………………………….. 20

*Montgomery v. Daniels*,
38 N.Y.2d 41, 50-51, 378 N.Y.S.2d 1, 340 N.E.2d 444 (N.Y. 1975)… 20

*Pereira v. United States,*
347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954)……………… 33, 34

*RJR Nabisco, Inc. v. European Cmty.*,
—— U.S. ——, 136 S.Ct. 2090, 2096, 195 L.Ed.2d 476 (2016)……… 33

*Schmuck v. United States,*
489 U.S. 705, 712, 109 S.Ct. 1443, 1448, 103 L.Ed.2d 734 (1989)…. 33

*State Farm Mut. Auto. Ins. Co. v. Cohan*,
2009 WL 10449036, at \*4 (E.D.N.Y. Dec. 30, 2009),
*report and recommendation adopted*, 2010 WL 890975
(E.D.N.Y. Mar. 8, 2010)……………………………………… 21

*State Farm Mut. Automobile Ins. Co. v. CPT Medical Services, P.C.*,
2008 WL 4146190, at \*6-\*7 (E.D.N.Y. Sept. 5, 2008)…………… 21

*State Farm Mut. Auto. Ins. Co. v. James M. Liguori, M.D., P.C.*,
589 F.Supp.2d 221, 229-235 (E.D.N.Y. 2008)……………………… 21

*State Farm Mut. Auto. Ins. Co. v. Mallela*,
372 F.3d 500, 502 (2d Cir. 2004) …………………………………… 2, 3, 4, 7, 14, 15, 19, 23, 24

*United States v. Bortnovsky*,
879 F.2d 30, 36 (2d Cir.1989)………………………………………… 33

*Viviane Etienne Medical Care, P.C. v. Country-Wide Ins. Co.*,
25 N.Y.3d 498, 506, 14 N.Y.S.3d 283, 35 N.E.3d 451 (N.Y. 2015)…. 20

*Williams v. Affinion Grp., LLC*,
889 F.3d 116, 124 (2d Cir. 2018)………………………………….. 34

**Statutes**

18 U.S.C. § 1962(c)…………………………………………… 32

18 U.S.C. § 1962(d)…………………………………………… 32

28 U.S.C. § 1332 (a)(1)………………………………………… 6

28 U.S.C. § 2201(2)(1)………………………………………… 21

N.Y. Bus. Corp. Law §1507 ………………….………….…. 3, 4, 15, 23

N.Y. Educ. Law §6530(18) ………………………………… 22

N.Y. Ins. Law §§ 5101 *et seq*.................................................. 19

N.Y. Ins. L. § 5106..………………………………….. 20, 21

N.Y. Pub. Health Law §4501 ……………………………… 22, 25

8 NYCRR § 29.1…………………………………….… 2, 4, 7, 22, 23, 27

11 NYCRR § 65-3.8(c)………………………………….. 20

11 NYCRR § 65-3.11 …………………………………… 19

11 NYCRR § 65-1.1(a), (d) ………………………………... 21

## **<u>Rules</u>**

Fed. R. Civ. P. Rule 50(a)………………………………………………...…… 17

Fed. R. Civ. P. Rule 56(a)…………………………………………………...18

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 26.1 and to Appellate Judges of the Court to evaluate possible disqualification or recusal, the undersigned counsel for Mingmen Acupuncture, P.C., Sanli Acupuncture, P.C., and Laogong Acupuncture, P.C. (all private non-governmental parties), certify that there are no corporate parents, affiliates and/or subsidiaries of each said party which are publicly held.

## **INTRODUCTION**

This appeal arises from a Decision by the Eastern District of New York, Judge I. Leo Glasser dated 8/24/2022, and Judgment dated 9/8/22 as modified on 9/14/22, denying appellant-defendants Igor Mayzenberg ("Mayzenberg"), Mingmen Acupuncture, P.C. ("Mingmen"), Sanli Acupuncture, P.C. ("Sanli") and Laogong Acupuncture, P.C. ("Laogong") (the business entities collectively "the Professional corporations") (all collectively, the "Mayzenberg Defendants") Motion for Summary Judgment and granting plaintiffs-appellees Government Employees Insurance Company, GEICO Indemnity Company, Geico General Insurance Company, and GEICO Casualty Company's (collectively "GEICO") motion for summary judgment (in part-the unjust enrichment claim was denied as moot) pursuant to Fed. R. Civ. P Rule 56.

For the reasons set forth in further detail below, the Mayzenberg Defendants' Motion for Summary Judgment should have been granted as there were no material facts in dispute and the Mayzenberg Defendants were entitled to judgment as a matter of law. GEICO's motion for summary judgment should have been denied in its entirety as the underlying court's decision was a clear error. GEICO's argument relied on a violation of Education Law 8 NYCRR 29.1 as a basis for asserting a *State Farm Mut. Auto. Ins. Co. v. Mallela*, 372 F.3d 500, 502 (2d Cir. 2004) claim ("*Mallela* claim"), and the lower Court's adoption of such was a novel,

unprecedented and unpersuasive position that should not have been countenanced by the lower court.

It is well settled and understood both in the Eastern District and in New York State Courts that *Mallela* supra, gave no-fault insurance carriers the ability to look beyond facially valid corporate documents to deny no-fault claims where the professional corporations providing services were in fact owned and controlled by laypersons. *Mallela* held that a professional corporation must be in compliance with local licensing laws in order to be eligible for reimbursement under New York's no-fault regulations. *Mallela* did not address alleged disciplinary violations by a professional corporation such as the prohibition against kickbacks for referrals and with good reason. The basis for the Court of Appeals holding in *Mallela* was that lay ownership of a professional corporation violated Section 1507 of the NY Business Corporation Law which in turn rendered the PC ineligible for reimbursement under the no-fault regulations. GEICO's attempt to extend *Mallela's* holding to include any violation of any rule by a professional corporation is unprecedented and beyond the scope of what the Court intended by *Mallela.* As argued by GEICO, any marketing and advertising done by medical professional corporations is considered a kickback and entitles an insurance company to refuse payment to that professional corporation.

At the heart of the issue herein is whether 8 NYCRR 29.1 is a "licensing law" within the meaning of *Mallela.* Clearly NY BCL §1507, at issue in *Mallela*, is a licensing law. The requirements of the Business Corporation Law, unlike the Education Law, are clearly directed at the issues of how a corporation and its shareholders, officers and directors function as licensed entities. In the event precedent is created whereby any violation of a disciplinary rule would render a professional corporation ineligible for reimbursement, one can imagine the onslaught of verification requests, Examination Under Oath requests and denials from the insurance industry.

Furthermore, GEICO advances no evidence of any payments which could be construed as kickbacks. Mingmen treated 1390 patients covered by GEICO policies over the course of seven years at one of Mingmen's four (4) office locations. There is simply no proof of any kind that any one of those 1390 patients were treated because of money paid by Sanli or Laogong to the Defendant Dovman entities, or any other entity. In fact, the vast majority of these patients were treated prior to any GEICO payments being made in September of 2015. GEICO insisted, wrongly, that Mayzenberg's payment of money for marketing and advertisement automatically constituted a "kickback" when there is no evidence of any GEICO patient being treated by any Mayzenberg professional corporation as a result of money being paid to a defendant Dovman entity. In fact, Mayzenberg never even heard of Dovman

4

prior to this lawsuit. Thus, it was a clear error for the Court to construe the advertising and marketing payments as kickbacks as there was no factual nexus between the money paid to the entities providing those services and any of the 1390 patients treated by Mingmen.

Finally, there is no evidence of a pre-existing protocol of patient treatment. All the patients received different types of treatment. As such, the Second Circuit should reverse the grant of summary judgment to GEICO and grant the motion for summary judgment made by the Mayzenberg Defendants as a matter of law.

## <u>STATEMENT OF JURISDICTION</u>

The District Court had jurisdiction over this matter pursuant to 28 U.S.C. Section 1332(a)(1) because the matter in controversy exceeds $75,000, exclusive of interests and costs, and the matter involves citizens of different states. (A2982). This Court has jurisdiction over this appeal pursuant to 28 U.S.C. Section 1291.

The appeal is from a final judgment dated September 8, 2022 (A3254) as Amended by Order and Final Judgment on September 14, 2022 (A 3258) disposing of all parties' claims, based on a decision and order dated August 24, 2022, by Hon. I. Leo Glasser, E.D.N.Y. The appeal was timely made by Notice of Appeal filed October 4, 2022 (A3260), and this brief is timely filed pursuant to the Second Circuit's Directive it be filed by March 27, 2023.

## **STATEMENT OF THE ISSUES**

1. Whether the District Court improperly held that a violation of Education Law 8 NYCRR 29.1 (kickbacks for referrals) is a violation of a licensing law that could be a basis for asserting a *Mallela* claim such that the Mayzenberg Defendants were not entitled to reimbursement of medical services provided to GEICO's insureds.

2. Even if 8 NYCRR 29.1 is construed as a licensing law, whether the District Court erred in making a factual finding that kickbacks for patient referrals occurred?

3. Whether the District Court erred when it found treatment protocols existed such that the Mayzenberg Defendants submitted claims for not medically necessary services despite the lack of evidence?

4. Whether the District Court erred in finding that a scheme to defraud GEICO existed?

5. Whether the District Court improperly found the Mayzenberg Defendants engaged in a RICO conspiracy?

6. Whether the District Court improperly found in favor of GEICO by declaring Mingmen is ineligible for reimbursement on its pending no-fault claims totaling $3,151,197.77?

## <u>STATEMENT OF THE CASE</u>

Defendant Mayzenberg is a licensed acupuncturist who owns and operates Mingmen, Sanli and Laogong (Professional corporations). (A3131-3132). The Professional Corporations routinely treat patients who were injured in automobile accidents and seek treatment under New York State's no-fault regulations. (A3135-3139). Automobile insurance carriers including GEICO are billed for that treatment. (A3132).

GEICO asserted eight (8) counts in its Amended Complaint:

1. Declaratory Judgment that GEICO does not have to pay for medical services rendered to GEICO insureds totaling over $2,700,000.00;

2. A 1962(c) RICO claim against Mayzenberg seeking recoupment of $486,000.00 paid to Mingmen;

3. A 1962(d) RICO claim against Sanli and Laogong seeking recoupment of $486,000.00 paid to Mingmen;

4. A Common Law Fraud claim against Mayzenberg and Mingmen seeking recoupment of $486,000.00 paid to Mingmen;

5. An Unjust Enrichment claim against Mayzenberg and Mingmen seeking recoupment of $486,000.00 paid to Mingmen;

6. Aiding and Abetting fraud against Defendant Dovman;

8

7. Common Law Fraud against Mayzenberg and Sanli seeking recoupment of $136,000.00 paid to Sanli; and

8. Unjust Enrichment against Mayzenberg and Sanli seeking recoupment of $136,000.00 paid to Sanli.

(A2982-3036).

GEICO alleged (1) the Mayzenberg Defendants billed for, and continue to seek recovery for, excessive and medically unnecessary acupuncture services, based on fabricated exams and treatment records, which were provided systematically, regardless of severity of the accident, regardless of the patient's age, and regardless of the type of injury, as part of a scheme to exploit New York's "No-Fault" insurance system; and (2) The Mayzenberg Defendants did not have their own stand-alone acupuncture practices, but instead operated out of a series of No-Fault "medical mills" in Brooklyn, Queens, and the Bronx. As part of the fraudulent scheme, GEICO alleges, without evidence, that Mayzenberg conspired with the Dovman Defendant and others to receive a steady stream of "patients" through no effort of his own, but rather through illegal fee splitting, kickback, and referral arrangements. (A20982-3036).

GEICO also alleged in the Amended Complaint that they have conclusive proof of a vast kickback scheme orchestrated by Mayzenberg and Igor Dovman. (A2982-3036). A close review of the facts advanced by GEICO tells a very different

story, and certainly shows, at the very least, GEICO should never have been granted summary judgment. Between January 2012 and April 2017 Mingmen Acupuncture, P.C. earned gross income in the amount of $3,606,519.50. (A3075-3128, A3133). Between January 2011 and December 2016 Sanli Acupuncture, P.C. earned gross income in the amount of $1,776,380.00. (A3067-3074, A3133). During the same period of time, the total amount  paid to the companies alleged by GEICO to be Defendant Dovman's companies by Sanli and Laogong was $389,182.00.  (A3129-3130, A3133)

Mayzenberg paid money to various companies for marketing and advertising in an effort to legally obtain patients for his practice. (A3135-3139). No money that was paid to Dovman and his associated companies was paid as a kickback nor paid to patients or runners to induce any patient to seek treatment at the Mingmen facility. (A3133). Of the seven (7) years Mingmen operated and treated GEICO patients, marketing and advertising payments only took place between the end of 2015 and the middle of 2017. (A3075-3130,A3133).

Mayzenberg paid money to Nina Brouk Advertisement and Dona Catalina Marketing LLC for marketing and advertisement services. (A3138-3139). He believed the money that ultimately went to the alleged Dovman companies to be for the same or similar services, and it was never paid as a kickback for referral of any patients. (A3138-3139). GEICO alleged that payments to attorney Daniel Corley

were also kickbacks for referrals, but Mayzenberg never received any patient referrals from Corley, or his legal practice and GEICO submits no proof that this occurred. (A3138-3139). GEICO incorrectly claimed that Mayzenberg admitted to paying kickbacks in his deposition, yet Mayzenberg only admitted to paying money for marketing and advertising, not for referrals of patients. In fact, Mayzenberg did not even know of Dovman until this lawsuit. (A3138-3139).

The Mayzenberg Defendants attached to their motion treatment records of four (4) GEICO patients. These records clearly demonstrated that: (a) the affidavit of Dr. Schram submitted by GEICO in support of its motion for summary judgment which asserted that the examination reports were "fabricated" was false; (b) the alleged "fraudulent treatment protocol" set forth in GEICO's amended complaint was a fiction; and (c) services were not provided "systematically, regardless of severity of the accident, regardless of the patient's age, and regardless of the type of injury, as part of a scheme to exploit New York's "No-Fault" insurance system" as alleged by GEICO. (A2832-2918, A3132).

The treatment records demonstrate completely varying diagnoses, treatment plans and lengths of treatment. (A2832-2918, A3132). Between 2012 and 2019, the Professional corporations treated 1390 patients eligible for coverage under GEICO policies (A3132). Of the 1390 patients, some were treated with standard acupuncture treatment, some also received moxibustion and some received cupping. There is

11

great variety in the length of treatment between the patients. Some patients were treated for 2 to 3 weeks, while some were treated for 6 months. The type of treatment and length of treatment was determined by the treating acupuncturist based on the condition and needs of the particular patient. (A2832-2918, A3132).

Finally, the Acupuncturists who provided services through Mingmen and Sanli were employees of the practices and not independent contractors. (A3133-A3134). The Acupuncturists treated Mingmen and Sanli patients only at Mingmen and Sanli's offices. Mingmen and Sanli provided all of the equipment and supplies necessary for the Acupuncturists to treat the patients. Mingmen and Sanli controlled the employment environment, including the scheduling and charts and billing. The Acupuncturists were paid as employees. (A3133-3134).

The Amended Complaint was filed April 6, 2018. GEICO filed a motion for summary judgment, which defendants opposed, on February 28, 2019 (A35-2826). The Mayzenberg Defendants filed a motion for summary judgment on February 28, 2019 (A2827-A3134), which GEICO opposed. The Dovman Defendants filed a motion for summary judgment or to dismiss on February 28, 2019. (Underlying docket entry no. 118). On August 24, 2022, the Court issued a Memorandum and Order granting GEICO's motion for summary judgment in part; denying the Mayzenberg Defendants' motion for summary judgment and denying the Dovman Defendants' motion for summary judgment. (A3252). The Court issued a Judgment

on September 8, 2022 (A3254) and then an Amended Final Judgment on September

14, 2022 (A3258). A Notice of Appeal was filed by the Mayzenberg Defendants on

October 4, 2022 (A3260).

## SUMMARY OF ARGUMENT

Each GEICO claim is based on the same nucleus of allegations: (a) the defendants engaged in a kickback/referral scheme; (b) the medical services were delivered pursuant to a fraudulent treatment protocol; and (c) the treating acupuncturists were independent contractors and not employees. (A2982-3036). The undisputed evidence illuminates gaping evidentiary holes in GEICO's theory which cannot be filled by negative inferences. Each of GEICO's claims are predicated upon the Mayzenberg Defendants engaging in a scheme to defraud GEICO. Put another way, GEICO alleges, and must prove, that the Mayzenberg Defendants made material misrepresentations of fact to GEICO, upon which GEICO reasonably relied and resulted in GEICO being damaged. GEICO cannot establish any facts to constitute a scheme to defraud.

GEICO is incorrect and the underlying Court wrong to construe a *Mallela* violation by a medical provider allegedly paying kickbacks for referrals as a basis for GEICO denying its obligations to make any payments, and to recoup what it did pay. This was not contemplated by the *Mallela* court and if this decision is left to stand, would make any payments for marketing or advertising prohibited as a violation of New York's licensing laws. The basis for the Court of Appeals holding in *Mallela* was that lay-ownership of a professional corporation violated Section

1507 of the NY Business Corporation Law which in turn rendered the PC ineligible for reimbursement under the no fault regulation.

The District Court's extension of *Mallela* to include any violation of any rule by a professional corporation is unprecedented and beyond the scope of what was originally intended by *Mallela.* The rules purportedly violated by the Mayzenberg Professional Corporations are not licensing laws at all but are in fact disciplinary rules. Further, public policy reasons would hold against any such extension of *Mallela* due to its impact on the broader medical community.

Even if the Court does extend *Mallela* in that fashion, in this case, there is simply no evidence of kickbacks for patient referrals. There is not one GEICO patient for which the mailing of the bill constitutes the predicate act of mail fraud based on the patient having been obtained by way of an illegal kick-back.

The deposition testimony, attached medical records, and sworn affidavits all indicate that all medical services were properly provided and were not part of a fraudulent treatment protocol. GEICO has no evidence to the contrary.

Finally, the evidence indicates that all of the treating providers were employees, and not independent contractors as GEICO asserts.

## <u>STANDARD OF REVIEW</u>

Summary Judgment decisions of a District Court are reviewed by the Circuit Court *de novo.* " *McBride v. BIC Consumer Prod. Mfg. Co., Inc.,* 583 F.3d 92, 96 (2d Cir. 2009).

## ARGUMENT

### A.    SUMMARY JUDGMENT STANDARD

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

As explained in *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. "[T]h[e] standard [for granting summary judgment] mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a)...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

Although a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact (*see* Celotex at 324), Rule 56 does not require that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim.

On the contrary, Rule 56(c), which refers to "the affidavits, *if any*" (emphasis added), suggests the absence of such a requirement. *Celotex* disposed of any doubt about the meaning of Rule 56(c) in this regard, with the Supreme Court clearing stating that such doubt is removed by Rules 56(a) and (b), which provide that claimants and defendants, respectively, may move for summary judgment "*with or without supporting affidavits*" (emphasis added).

As such, regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied. *Id*. at 323.

One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose. *Id.* at 324.

As discussed above, GEICO asserts eight (8) counts in its Amended Complaint which are all based on the same common allegations (a) the Mayzenberg Defendants engaged in a kickback/referral scheme; (b) the medical services were delivered pursuant to a fraudulent treatment protocol; and (c) the treating acupuncturists were independent contractors and not employees. GEICO cannot establish any of this as a matter of law, but the Mayzenberg Defendant did establish their entitlement to summary judgment.

## B.    THE NO-FAULT STATUTORY FRAMEWORK IN NEW YORK

The Comprehensive Motor Vehicle Insurance Reparations Act, *see* N.Y. Ins. L. §§ 5101 *et seq.* (formerly N.Y. Ins. Law §§ 670 *et seq.*) sets forth New York's no-fault scheme and "supplant[s] the state's common law tort remedies for most injuries associated with automobile accidents with a no-fault insurance scheme." *Mallea*, *supra*, 502 (2d Cir. 2004).  Under the statute, automobile insurers must provide coverage for "basic economic loss," including medical expenses, arising out of the use or operation of a covered motor vehicle, without regard to fault. *See* N.Y. Ins. L. §§ 5102, 5103; *Mallela*, 372 F.3d at 502. The insured's claim may be assigned to his or her provider, who bills the insurer directly. *See* 11 NYCRR § 65-3.11.

The purpose of the no-fault system is threefold: "to ensure prompt compensation for losses incurred by accident victims without regard to fault or negligence, to reduce the burden on the courts and to provide substantial premium

savings to New York motorists." *Medical Society of State v. Serio*, 100 N.Y.2d 854, 860, 768 N.Y.S.2d 423, 800 N.E.2d 728 (N.Y. 2003); *see Montgomery v. Daniels*, 38 N.Y.2d 41, 50-51, 378 N.Y.S.2d 1, 340 N.E.2d 444 (N.Y. 1975) (discussing reasons for the no-fault statute's enactment).

Section 5106 creates a "[f]air claims settlement" procedure for all no-fault claims. No-fault benefits are deemed overdue if they are not paid or denied within 30 calendar days after proof of claim is submitted. *See* N.Y. Ins. L. § 5106(a); 11 NYCRR § 65-3.8(c).

If an insurer fails to comply with this timeframe, it will be precluded from asserting many (but not all) defenses to coverage, including most fraud-based defenses. *See Fair Price Medical Supply Corp. v. Travelers Indem. Co.*, 10 N.Y.3d 556, 860 N.Y.S.2d 471, 890 N.E.2d 233 (2008); *Central Gen. Hosp. v. Chubb Group of Ins. Companies*, 90 N.Y.2d 195, 199, 659 N.Y.S.2d 246, 681 N.E.2d 413 (1997).

A claimant may bring an action in state court to recover overdue no-fault benefits, and in any such action the claimant need only show that the prescribed statutory billing forms were mailed and received and that the benefits are overdue. *See Viviane Etienne Medical Care, P.C. v. Country-Wide Ins. Co.*, 25 N.Y.3d 498, 506, 14 N.Y.S.3d 283, 35 N.E.3d 451 (N.Y. 2015).

In addition, New York Insurance Law requires carriers to include a clause in their policies allowing the claimant to seek arbitration of their claims for no-fault benefits. *See* N.Y. Ins. L. § 5106(b); 11 NYCRR § 65-1.1(a), (d).

An insurer who pays no-fault benefits and subsequently discovers fraud may bring an action for damages. *See State Farm Mut. Auto. Ins. Co. v. James M. Liguori, M.D., P.C.*, 589 F.Supp.2d 221, 229-235 (E.D.N.Y. 2008); *State Farm Mut. Automobile Ins. Co. v. CPT Medical Services, P.C.*, 2008 WL 4146190, at \*6-\*7 (E.D.N.Y.).

The insurer may also bring an action for a declaratory judgment that it is not liable for any unpaid claims where the provider has committed fraud or breached applicable no-fault regulations. *See* 28 U.S.C. § 2201; *Government Employees Ins. Co. v. Jacques*, 2017 WL 9487191, at \*9-\*11 (E.D.N.Y.), *report and recommendation adopted*, 2017 WL 1214460 (E.D.N.Y.); *State Farm Mut. Auto. Ins. Co. v. Cohan*, 2009 WL 10449036, at \*4 (E.D.N.Y.), *report and recommendation adopted*, 2010 WL 890975 (E.D.N.Y.).

However, if an insurer is precluded from asserting a defense to coverage (such as provider fraud) due to its noncompliance with the 30-day rule, it will also be precluded from obtaining a declaratory judgment on those same grounds. *See Allstate Ins. Co. v. Williams,* 2015 WL 5560543, at \*7 (E.D.N.Y.); *Government*

*Employees Ins. Co. v. AMD Chiropractic, P.C.*, 2013 WL 5131057, at *8 (E.D.N.Y.).

It is within this framework that GEICO's claims must be evaluated. Each of GEICO's claims are predicated upon these Defendants engaging in a scheme to defraud GEICO. Put another way, GEICO alleges, and must prove, that the Mayzenberg Defendants made material misrepresentations of fact to GEICO, upon which GEICO reasonably relied and resulted in GEICO being damaged.

## C.  DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE ISSUE OF KICKBACKS

### (a)  Kickbacks Cannot Be a Basis for GEICO Not Paying Medical Services Rendered by Mayzenberg Defendants or Recouping Payments Already Made

New York Education Law, 8 NYCRR § 29.1 provides that a medical professional corporation "directly or indirectly offering [or] giving ... any fee or other consideration to or from a third-party for the referral of a patient ... in the connection with the performance of professional services" is engaging in unprofessional conduct. The statute does not prohibit engaging in marketing and advertising but is rather a prohibition of the exchange of money or other consideration for the referral of a patient, i.e., exchanging money for the chance to treat a specific patient. GEICO cites Public Health Law §4501, Education Law §6530(18) and 8 NYCRR §29.1 in support of its position that kickbacks are prohibited under New York law.

GEICO's reliance on a violation of Education Law 8 NYCRR 29.1 as a basis for asserting a *Mallela* claim is a novel, unprecedented and unpersuasive position. It is well settled and understood both in the Eastern District and in New York State Courts that *Mallela* gave carriers the ability to look beyond facially valid corporate documents to deny no-fault claims where professional corporations were in fact owned and controlled by laypersons. The basis for the Court of Appeals holding was that lay-ownership of a professional corporation violated Section 1507 of the NY Business Corporation Law. This violation of a New York State licensing law rendered the PC ineligible for reimbursement under the no-fault regulation. GEICO's purported extension of *Mallela* to any violation of any rule by a professional corporation is unprecedented and beyond the scope of the was intended by *Mallela.*

At the heart of the issue is whether 8 NYCRR 29.1 is a "licensing law" within the meaning of *Mallela.* Clearly NY BCL §1507, at issue in *Mallela*, is a licensing law. The requirements of the Business Corporation Law are clearly directed at the functioning of a corporation as a licensed entity and the behavior of its shareholders, officers and directors. *Mallela* held that a fraudulently incorporated company could not be reimbursed for medical services when the companies were really owned by laypersons/non-doctors, as this was a violation of a licensing law. The licensing laws of New York State prohibit non-physicians to open medical practices. So, if non

23

physicians actually owned and controlled a medical practice, that is a violation of the licensing law, and that practice would be ineligible for reimbursement under New York's no-fault regulatory scheme. That is not the issue here.

The statutes that GEICO alleges were violated by the Mayzenberg Defendants - kickbacks for referrals -, are not licensing laws at all but are in fact disciplinary rules. Following the *Mallela* doctrine, the Mayzenberg Defendants were incorporated properly by a licensed acupuncturist and are thus eligible for reimbursement. The purported violation of a disciplinary rule is not the same as the violation of a licensing law and there is simply no authority for the extension of *Mallela* to these facts. In the event this new precedent is created whereby any violation of a disciplinary rule would render a professional corporation ineligible for reimbursement, one can imagine the onslaught of verification requests, Examination Under Oath requests and denials from the insurance industry. Potentially, any payment by a professional corporation the insurer deems suspect could be characterized as a kickback and form the basis for the denial of claims. Professional corporations will be put in the position of opening all its books and records for scrutiny, and defending each of its payments for services for each claim it submits.

The broad reading of the statutes by GEICO would render all marketing and advertising prohibited. Memorial Sloane Kettering and all the major hospitals in New York advertise on the radio every day. It is fair to assume that these radio ads

result in patients seeking medical treatment at these hospitals. It is also fair to assume that the hospitals pay large sums of money to advertising and marketing firms as well as radio stations to produce and air the ads. Paying money to an entity in the hopes that patient flow is generated is not an illegal act and does not constitute a kickback scheme. Paying an entity or individual to recruit a specific patient and paying for that specific referral is different and not the factual scenario present in this case.

The New York DOH Opinion letter concerning PHL §4501 (prohibition against medical referral service) clearly establishes the following:

> "Thus, there are only two means by which your client can impose a fee of some sort for a directory of physicians without violating 4501. The first would be to provide a listing of all physicians in the area covered by the directory to potential patients in exchange for a fee to be paid by each potential patient for the list, and the second would be to charge a fee to each physician who wishes to be listed (essentially an advertising fee) but make the listing available to potential patients for free."

There is no evidence in this case that any GEICO patient ever paid a fee to anyone for anything.

**(b)  Even if Proof of Kickbacks for Referrals Would Be a Reason to Deny Payment, GEICO Failed to Demonstrate Any Kickbacks for Referrals Actually Occurred Here**

GEICO alleges in the Amended Complaint that they have conclusive proof of a vast kickback scheme orchestrated by Mr. Mayzenberg and Igor Dovman. (A2982-3036). A close review of the facts advanced by GEICO tells a very different story, and certainly shows, at the very least, GEICO should never have been granted summary judgment.

GEICO has not and cannot demonstrate a single GEICO patient (or any patient for that matter) that treated with one of the professional corporations as a result of money paid by Mayzenberg to any entity allegedly controlled by defendant Igor Dovman.  There is a complete absence of proof as to any of this money being used as a kickback or to further any illicit referral of patients to any of the professional corporations. After years of investigation and thousands of pages of documents obtained by subpoenas, GEICO can only show a series of checks written by Sanli and Laogong to various corporations. That is the entirety of their proof. Everything else advanced by GEICO is an inference or supposition. There is not a single affidavit from any of the 1390 patients with first-hand knowledge that they were referred based on a kickback scheme. Moreover, there is not a single affidavit from anyone else with first-hand knowledge as to the alleged kickback scheme.

GEICO has submitted no evidence of a kickback scheme for referrals.  GEICO

simply concludes that because Mr. Mayzenberg wrote checks through Sanli to certain Dovman companies, this money constitutes a kick back in violation of the New York Education Law, 8 NYCRR § 29.1, which provides that a medical Professional corporation "directly or indirectly offering [or] giving ... any fee or other consideration to or from a third-party for the referral of a patient...in the connection with the performance of professional services" is engaging in unprofessional conduct. But GEICO's conclusions and suppositions are not undisputed facts, nor do they make the payments illegal kickbacks as a matter of law.

Having failed to provide any proof of kickbacks for referrals, GEICO's motion should have been denied. Moreover, as the Mayzenberg Defendants have submitted proof in the form of documents and an affidavit from Mayzenberg that there were proper advertising and marketing payments, and that the vast majority of the 1390 patients were seen prior to any payments being made in September of 2015 and it was not possible for them to be part of the no-fault scheme.

The true gravamen of GEICO's case rests on the alleged kick-back scheme between Igor Mayzenberg and Igor Dovman. It is undisputed that between September 16, 2015 and August 31, 2017 Sanli and Laogong paid the total sum of $389,182.00 to sixteen (16) companies referred to by GEICO as Dovman Companies. (A3129-3130, A3136). It is also undisputed that no money was paid to

Dovman or any Dovman entities by Mingmen, Mayzenberg or Sanli from January 2011 until September 16, 2015, a four (4) year and eight (8) month period when Sanli and Mingmen treated patients eligible for benefits under GEICO policies. (A3136).  During this same period of time (January 2011 to April 2017) Sanli and Mingmen grossed $5,382,899.50 in total income. (A3136).

In total, between January 2012 and April 2017 Mingmen Acupuncture, P.C. earned gross income in the amount of $3,606.519.50. (A3075-3128, A3133). Between January 2011 and December 2016 Sanli Acupuncture, P.C. earned gross income in the amount of $1,776,380.00. (A3067-3074, A3133).  There is a complete absence of proof as to any of this money being used as a kickback or to further any illicit referral of patients to any of the Professional corporations.

Mayzenberg paid money to various companies for marketing and advertising in an effort to legally obtain patients for his practice.  (A3135-3139). No money paid to Defendant Dovman and associated companies was paid as a kickback or paid to patients or runners to induce any patient to seek treatment at the Mingmen facility. (A3133).

Of the seven (7) years Mingmen operated and treated GEICO patients, these payments only took place between the end of 2015 and the middle of 2017. (A3075-3130,A3133). Mayzenberg paid money to Nina Brouk Advertisement and Dona Catalina Marketing LLC for marketing and advertisement services. (A3138-3139).

He believed the money that ultimately went to the alleged Dovman companies to be for the same or similar services, and it was never paid as a kickback for referral of any patients. (A3138-3139).

GEICO alleged that payments to attorney Daniel Corley were kickbacks for referrals, but Mayzenberg never received any patient referrals from Corley or his legal practice and GEICO submits no evidence that this occurred. (A3138-3139). GEICO incorrectly claimed that Mayzenberg admitted to paying kickbacks in his deposition yet all he admitted to was paying money for marketing, not referrals of patients. In fact, Mayzenberg did not even know of the defendant Igor Dovman until this lawsuit. (A3138-3139). The only evidence solicited by GEICO is that the Mayzenberg Defendants paid Nina Brouk Advertisement, LLC, Dona Catalina Marketing, LLC, Desiree Reid and the Dovman entities to market, advertise and promote his practices, all of which are permitted activities.

As such, the District Court could not have properly concluded that the Mayzenberg Defendants defrauded GEICO out of any money as GEICO cannot demonstrate that it could have successfully withheld payment of the 1390 patients' claims (including the 2011 to 2015 claims) based on the payments made to the alleged shell companies between September 2015 and 2017.

**D.**     **The Alleged Fraudulent Treatment Protocol**

GEICO's allegations about a "fraudulent treatment protocol" are simply not supported by any real tangible evidence. GEICO has attached a brief affidavit of an acupuncturist, but it is filled with conclusions and is unsupported by any significant analysis or records. At the root of GEICO's argument is that the services rendered to its insureds and eligible insured persons were not "medically necessary". This question is at the heart of virtually every no-fault arbitration and lower state court litigation between GEICO and the PC defendants. GEICO would have the Court believe that none of the services provided to the 1390 patients were medically necessary.

The random sampling of treatment records attached to the Declaration of Counsel and explained by Mayzenberg (A3131-3134) clearly and definitively refutes the conclusory facts advanced by GEICO that all patients received the identical diagnosis and treatment regardless of age, injury or response to treatment.

Equally important, GEICO must prove that the Mayzenberg Defendants made material misrepresentations of fact, which they relied on to their detriment.  As it relates to Mingmen's treatment and billing submissions, GEICO bears the burden of demonstrating more than just that the services were not medically necessary, but that Mayzenberg and Mingmen knew the services were not necessary and misled GEICO into believing that they were.

In the motion papers below, GEICO offered no factual support for their assertion that Mayzenberg Defendants submitted any fabricated exams and treatment records. The affidavit of Steven Schram was a cursory and entirely conclusory submission that did not attach a single treatment record. Dr. Schram's affidavit couches his purported findings by stating, for example, "virtually every patient with a neck complaint was noted to have pain and tenderness at the base of the neck." In fact, Dr. Schram used the word "virtually" four (4) times in the same sentence. (A3180-3207).

The Mayzenberg Defendants attached to its motion treatment records of four (4) Geico patients which clearly demonstrated that: (a) Dr. Schram's assertion that the examination reports were "fabricated" was false; (b) the alleged "fraudulent treatment protocol" set forth in GEICO's amended complaint was a fiction; and (c) services were not provided "systematically, regardless of severity of the accident, regardless of the patient's age, and regardless of the type of injury, as part of a scheme to exploit New York's "No-Fault" insurance system" as alleged by GEICO. (A2832-2918, A3132).

The attached treatment records demonstrate completely varying diagnoses, treatment plans and lengths of treatment. (A2832-2918, A3132). Between 2012 and 2019, the Professional corporations treated 1390 patients eligible for coverage under GEICO policies (A3132).

Of the 1390 patients, some were treated with standard acupuncture treatment, some also received moxibustion and some received cupping. There is great variety in the length of treatment between the patients. Some patients were treated for 2 to 3 weeks, while some were treated for 6 months. The type of treatment and length of treatment was determined by the treating acupuncturist based on the condition and needs of the particular patient. (A2832-2918, A3132).

Moreover, the Acupuncturists who provided services through Mingmen and Sanli were employees and not independent contractors. (A3133-A3134). The Acupuncturists treated Mingmen and Sanli patients only at Mingmen and Sanli's offices. Mingmen and Sanli provided all of the equipment and supplies necessary for the Acupuncturists to treat the patients. Mingmen and Sanli controlled the employment environment, including the scheduling and charts and billing. The Acupuncturists were paid as employees. (A3133-3134).

## E.   GEICO's CLAIMS ARE UNSUPPORTABLE

### (a)   Civil Rico [1962 (c) & (d)]

To establish a civil RICO violation under 18 U.S.C. § 1962(c), GEICO must prove that it were "injured by defendants' (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999). As to the enterprise requirement, GEICO must "prove the existence of two distinct entities: (1) a 'person'; and (2) an

'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001).

Members of the enterprise must, among other things, share a common purpose. *See Boyle v. United States*, 556 U.S. 938, 946, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009).

"Racketeering activity" "encompass[es] dozens of state and federal offenses, known in RICO parlance as predicates. These predicates include any act indictable under specified federal statutes, as well as certain crimes chargeable under state law." *RJR Nabisco, Inc. v. European Cmty.*, ––– U.S. ––––, 136 S.Ct. 2090, 2096, 195 L.Ed.2d 476 (2016) (internal citations and quotation marks omitted).

In this matter GEICO alleges a violation of the mail fraud statute. To prove a violation of the mail fraud statute, GEICO must establish the existence of a fraudulent scheme and a mailing in furtherance of the scheme. *See Schmuck v. United States,* 489 U.S. 705, 712, 109 S.Ct. 1443, 1448, 103 L.Ed.2d 734 (1989); *Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). While there is no requirement that the defendant personally mail a letter GEICO must show "1) that the defendant 'caused' the mailing ... and 2) that the mailing was for the purpose of executing the scheme or ... 'incidental to an essential part of the scheme.' " *United States v. Bortnovsky,* 879 F.2d 30, 36 (2d Cir.1989) (quoting

33

*Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–63, 98 L.Ed. 435 (1954)).

To prove a RICO conspiracy, GEICO must prove "the existence of an agreement to violate RICO's substantive provisions." *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 124 (2d Cir. 2018). GEICO cannot establish any facts to constitute a scheme to defraud. There is not one GEICO patient for which it can be said the mailing of the bill constitutes the predicate act of mail fraud based on the patient having been obtained by way of an illegal kick-back, as discussed above.

### (b) Common Law Fraud

In order to state a claim for fraud under New York law, a plaintiff is required to allege the following five elements: "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." *Crigger v. Fahnestock & Co.,* 443 F.3d 230, 234 (2d Cir.2006); *see also Cohen v. Houseconnect Realty Corp.,* 289 A.D.2d 277, 278, 734 N.Y.S.2d 205 (N.Y.App.Div.2001).

Similarly, there is no basis for GEICO to make a common law fraud claim as there is no evidence of any material misrepresentation, an intent to defraud or reliance by GEICO. As such, the Court cannot conclude that the Mayzenberg Defendants defrauded GEICO out of any money as GEICO cannot demonstrate that

it could have successfully withheld payment of the 1390 patients' claims (including the 2011 to 2015 claims) based on the payments made to the alleged shell companies between September 2015 and 2017.

### (c)    Unjust Enrichment

In order to state a claim for unjust enrichment, "plaintiff must establish 1) that the defendant benefitted; 2) at plaintiff's expense; and 3) that 'equity and good conscience' require restitution." *Kaye v. Grossman,* 202 F.3d 611, 616 (2d Cir.2000). (citing *Dolmetta v. Uintah Nat'l Corp.,* 712 F.2d 15, 20 (2d Cir.1983)).

Again, there is no evidence that the Mayzenberg Defendants benefitted at GEICO's expense. Rather, they provided a medical service to GEICO insureds and were compensated or should be compensated for same.

## <u>CONCLUSION</u>

For the foregoing reasons, the judgment of the District Court should be reversed, GEICO's motion for summary judgment be denied in its entirety, and the Mayzenberg Defendants' motion for summary judgment granted in its entirety and the case dismissed against them.

Dated:  March 27, 2023
       Garden City, New York

           Defendants
           IGOR MAYZENBERG
           SANLI ACUPUNCTURE, P.C.
           MINGMEN ACUPUNCTURE, P.C.
           LAOGONG ACUPUNCTURE, P.C.

           By counsel,


           _____*s/ Matthew J. Conroy*_____
           Matthew J. Conroy (MC 9014)
           SCHWARTZ LAW, P.C.
           666 Old Country Road – 9th Floor
           Garden City, NY 11530
           (516) 745-1122

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limits of Federal Rule of Appellate Procedure 32)(a)(7)(B) because it contains 7134 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in Times Roman 14-point font, a proportionally spaced typeface.

s/*Matthew J. Conroy*

_____

Matthew J. Conroy, Esq.

**SPECIAL APPENDIX**

# **Table of Contents**

**Page**

Transcript of the Proceedings held before the
  Honorable I. Leo Glasser on May 14, 2019.................................   SPA1

Memorandum and Order of the Honorable I. Leo Glasser,
  dated September 6, 2022............................................................   SPA37

Judgment of the United States District Court, Eastern District of
  New York, entered September 8, 2022......................................   SPA39

Letter from Steven T. Henesy to the Honorable I. Leo Glasser,
  dated September 13, 2022..........................................................   SPA41

Amended Final Judgment of the United States District Court,
  Eastern District of New York, entered September 8, 2022 .......   SPA43

Notice of Appeal, dated October 4, 2022  ........................................   SPA45

i

1

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2
    - - - - - - - - - - - - - - - X
3
    GOVERNMENT EMPLOYEES INSURANCE :
4   COMPANY, et al.,                        17-CV-2802(ILG)

5              Plaintiffs,        :
                                            United States Courthouse
6         -against-              :          Brooklyn, New York

7   IGOR MAYZENBERG, et al.,      :
                                            May 14, 2019
8              Defendants.        :         2:00 o'clock p.m.

9   - - - - - - - - - - - - - - - X

10              TRANSCRIPT OF MOTION
         BEFORE THE HONORABLE I. LEO GLASSER
11         UNITED STATES SENIOR DISTRICT JUDGE.

12  APPEARANCES:

13  For the Plaintiff GEICO:      RIVKIN, RADLER LLP
                                  926 RXR Plaza
14                                Uniondale, NY 11556-0926

15                                BY: MICHAEL A. SIRIGNANO, ESQ.
                                      STEVEN HENESY, ESQ.
16
    For Defendants Mayzenberg,
17  Mingmen, Sanli and Laogong:   SCHWARTZ, CONROY & HACK, PC
                                  666 Old Country Road, Suite 900
18                                Garden City, NY 11530

19                                BY: MATTHEW J. CONROY, ESQ.

20
    For Defendant T. Dovman:      DINARA MAYLOV, ESQ.
21                                2747 Coney Island Avenue
                                  Brooklyn, New York  11235
22
    Court Reporter:               Charleane M. Heading
23                                225 Cadman Plaza East
                                  Brooklyn, New York
24                                (718) 613-2643

25  Proceedings recorded by mechanical stenography, transcript
    produced by computer-aided transcription.

1       THE CLERK:  Civil cause for motion.  GEICO, et al.

2  versus Mayzenberg, et al.

3       Counsel, please come forward and state your

4  appearances for the record.

5       MR. SIRIGNANO:  Good afternoon, Your Honor.  My name

6  is Michael Sirignano from the law firm of Rivkin Radler along

7  with associate Steven Henesey.  We represent the plaintiffs

8  collectively known as GEICO.

9       THE COURT:  Good afternoon.

10       MR. HENESEY:  Good afternoon, Your Honor.

11       MR. CONROY:  Good afternoon.  Matthew Conroy and I

12  represent the defendants Igor Mayzenberg, Sanli Acupuncture,

13  Mingmen Acupuncture and Laogong Acupuncture.

14       THE COURT:  Good afternoon.

15       MS. MAYLOV:  Good afternoon, Judge.  I'm Dinara

16  Maylov and I represent Tamilla Dovman.

17       THE COURT:  Good afternoon.  You all may sit down.

18       Does plaintiff want to be heard on these motions for

19  summary judgment?

20       MR. SIRIGNANO:  Yes, Your Honor.  Thank you.

21       THE COURT:  I want to listen to the plaintiffs

22  first.

23       MR. SIRIGNANO:  Plaintiffs have moved for summary

24  judgment, Your Honor --

25       THE COURT:  Stand up and use the mic.

**SPA3**

3

1      MR. SIRIGNANO:  Plaintiffs, Your Honor, have moved

2  for summary judgment against all defendants on all claims but

3  only as to a single issue involving defendants' wrongful

4  conduct.  There's a number of items of wrongful conduct but

5  the motion for summary judgment is based on the defendants

6  engaging in a scheme to defraud GEICO by having Mingmen

7  Acupuncture submit bills for acupuncture services that were

8  the product of a patient referral and kickback scheme.

9      Plaintiffs' motion for summary judgment is based on,

10  first, the law of this case and a mountain of undisputed

11  evidence confirming that this patient kickback and referral

12  scheme took place and as you'll find out, there's really no

13  dispute about the key operative facts about this patient

14  kickback and referral scheme.

15      Now, first, as to the law of the case, this court

16  has already held in a memorandum and order dated November 16,

17  2018 that the payment of kickbacks by a healthcare provider

18  like Mingmen Acupuncture renders that provider ineligible to

19  recover benefits under the no fault law and we can talk about

20  that further, but that ruling has already been made in

21  connection with a prior motion that the plaintiffs filed in

22  this case.

23      THE COURT:  Do I understand you to say there is no

24  dispute at all as to whether there were kickbacks for

25  services?  Did I hear that?

**SPA4**

4

1      MR. SIRIGNANO:  Yes, you did.  The dispute is not

2  about the operative facts.  They're attempting to raise a

3  dispute but it's -- the entirety of their defense is based on

4  Mr. Mayzenberg's claim that he had an understanding that the

5  payments made to a series of shell companies were from

6  marketing and advertising expenses.  That understanding is not

7  supported by a single objective fact.

8      THE COURT:  But the fact is that there is a dispute

9  as I get it as to whether there were kickbacks.

10     MR. SIRIGNANO:  No.  There's not a dispute as to --

11     THE COURT:  Does Mr. Mayzenberg dispute it at all?

12     MR. SIRIGNANO:  Mr. Mayzenberg disputes the fact

13  that these payments are legally considered to be kickbacks.

14     He doesn't dispute that he made payments for

15  referrals of patients.  He specifically testified repeatedly

16  and he's put no evidence to counter plaintiffs' arguments that

17  he paid monies to have patients sent to medical clinics.  I

18  can go through a series --

19     THE COURT:  Excuse me.  I am a little confused.

20     As I understand, GEICO's claim is that they were

21  being billed for medical services which were either not

22  performed or unnecessarily performed and for services that

23  were obtained by virtue of kickbacks that were made by, as I

24  believe it, the Dovmans or referrals made by the Dovmans and

25  that Mayzenberg claims that the payments that he made were not

1  for kickbacks, not for referral of services, but for

2  advertising, consulting and whatever other services Dovman

3  provides.  As I understand it, the dispute is whether he paid

4  for referral services.  He says that he did not.  So when you

5  say there is no dispute about what is the essential fact on

6  which you are basing your claim, I am having trouble

7  understanding that.

8         MR. SIRIGNANO:  There is no genuine dispute that

9  requires a trial because all of the operative facts regarding

10  the payments are undisputed.  It's the characterization of

11  those payments.

12         Now, under the law, Your Honor, under the education

13  law, paying for patient referrals, offering to pay for patient

14  referrals, whether directly or indirectly, is a violation of

15  the law and while Mr. Mayzenberg has submitted an affidavit

16  that contains one sentence saying it's his understanding that

17  certain vague payments were for marketing and advertising,

18  everything else in the case, objectively, is absolutely clear

19  that those payments were made to send patients to the clinics.

20         So if you look at the law which says payments made

21  directly or indirectly, as a matter of law, he can

22  characterize them as his belief but that doesn't change what

23  those payments were for under the law, and he has to have some

24  evidence supporting his understanding, Your Honor.  There is

25  absolutely no evidence supporting his understanding.

**SPA6**

6

1          And very briefly, if I may, because there are

2     clearly undisputed material facts here that they concede that

3     will demonstrate that Mr. Mayzenberg's understanding has no

4     concrete foundation whatsoever, there's not a shred of

5     evidence, and that can be determined through, number one --

6     you know, there's a lot of paper here but there is no dispute

7     about the fact that Mr. Mayzenberg made $389,000 in payments

8     to these Dovman shell companies.

9          There is no dispute that the Dovman shell entities

10    did not conduct any marketing and advertising services.  They

11    admit that.  There's no dispute that the Dovman shell entities

12    did not perform any legitimate business activity.  There's no

13    dispute about that.  There's no dispute about the manner in

14    which Mr. Mayzenberg made the payments and I think this is

15    significant.

16         He testified, and there's no dispute about this,

17    that he made these payments that he says, it was my

18    understanding, to be marketing and advertising, he made these

19    payments when he got a phone call from some complete stranger

20    at his office who told him how much he should be paying and he

21    left those checks, he filled out an amount of the checks

22    without ever, over the course of two years, indicating in the

23    memo line of the check what those checks were for.  He left

24    every single check blank over the course of two years.  Those

25    checks, he just left with, again, complete strangers to pick

Case 22-2537, Document 108, 03/27/2023, 3490071, Page53 of 92
**SPA7**
Case 1:17-cv-02802-ILG-LB   Document 144   Filed 01/05/21   Page 7 of 36 PageID #: 14153

7

1   those checks up from his office.

2          The checks were written to companies not with

3   marketing and advertising names in them.  The checks were

4   written to companies like ML Garbage, MN Surgical Supply, Rig

5   Testing.  That's the manner in which he made these payments.

6          Secondly, there was no evidence -- he never got an

7   invoice.  He admits that.  He admits that in the material

8   statement of facts.  In two years, $389,000 worth of payments,

9   he never got a single invoice from any one of those companies.

10  He also admits that there's not a shred of paper proving any

11  marketing and advertising.  We've asked him.  He has nothing.

12  So all of that is admitted.  He also admits paying someone

13  named Desiree Reid for patient referrals.  Now, again, he says

14  that was an indirect payment for a referral.  He's also paid

15  for-profit medical referral companies.

16          Finally, Your Honor, there's no dispute about the

17  ultimate purpose of the payments.  Now, Mr. Mayzenberg, again,

18  in one line says, well, I know all this evidence exists but

19  it's my understanding that they were supposed to go for

20  marketing and advertising.  But the ultimate purpose of the

21  payments, Mr. Mayzenberg made clear over and over again, he

22  said those payments were to send patients to the clinics.  He

23  said even if the patients had to be found in the garbage and I

24  paid a garbage company to send patients to the clinics, that's

25  why I made the payments.  He said it was his sole concern.

8

1  Why he made those payments was to send patients to the

2  clinics.

3        So when you add up all of that mountain of evidence,

4  the only thing that we have on the other side is

5  Mr. Mayzenberg saying, well, forget all of that evidence, I

6  kind of believe, I had a vague understanding that, you know, I

7  sent these checks to complete strangers and it was my kind of

8  understanding that they were for marketing and advertising.

9  It's our position that when plaintiffs present a mountain of

10  evidence like this and the only thing in opposition is a

11  single sentence, essentially, two words that it was his

12  understanding, that that is not sufficient to defeat summary

13  judgment in favor of plaintiffs, especially since Your Honor

14  already ruled that payments under the education law, whether

15  made directly or indirectly for patient referrals, is a

16  violation of the no fault law.

17        So, in summary, Your Honor, we have all of this

18  evidence and nothing that creates a genuine dispute that these

19  payments violate the education law.  That's where plaintiffs

20  believe they're entitled to summary judgment.

21        By the way, Your Honor, the other defendants in this

22  case, Igor Dovman, he pled the Fifth Amendment and he invoked

23  the Fifth Amendment in response to every substantive

24  allegation in plaintiffs' complaint.  You would think that

25  Mr. Dovman would support Igor Mayzenberg.  He's the one that

**SPA9**

9

1  supposedly provided the marketing and advertising expenses,

2  services.  Instead, he refused to oppose the motion for

3  summary judgment.

4          So if you put Igor Dovman and Igor Mayzenberg and

5  Tamilla Dovman together -- Tamilla Dovman is the third

6  defendant in this case.  She did not submit any evidence in

7  opposition to plaintiff's motion.  She didn't submit a sworn

8  affidavit.  She didn't submit any evidence.  What she did is

9  in response to plaintiffs' Rule 56 statement, she said to

10  virtually every material fact, she lacked knowledge and

11  information to provide a response.  The case law is clear that

12  that is insufficient and that Tamilla Dovman has been deemed

13  and should be deemed to have admitted all of the material

14  facts in plaintiffs' case.

15          So, in summary, Your Honor, I'll be happy to go on,

16  but there's a lot of evidence here and when you cut through

17  what the defendants are saying, ask them what particular facts

18  do they dispute.

19          There's nothing from Tamilla Dovman.  She says she

20  lacks knowledge.  She didn't want to find out what happened

21  here.  Her husband, Igor Dovman, was involved in the patient

22  kickback scheme.  She worked with him at his law office.  She

23  was married to him.  She was president on a number of the

24  shell companies.  She wants to bury her head in the sand and

25  say you can't get summary judgment against me.  That's not

1    appropriate under law.

2         Igor Dovman has defaulted on the motion for summary

3    judgment so that leaves Mr. Mayzenberg and the Mingmen

4    defendants and they have not submitted anything concrete,

5    anything genuine that amounts to a triable issue of fact to

6    dispute the litany of undisputed facts that I went through

7    with Your Honor.

8         THE COURT:  What you are saying, as I understand it,

9    is that circumstantially, there can be no doubt but that

10   payments were made by referrals directly and indirectly.

11   These payments were made by Mr. Mayzenberg directly to whom?

12        MR. SIRIGNANO:  The payments were made by both

13   Mr. Mayzenberg and some -- to a series of shell companies that

14   do not exist.  Mr. Mayzenberg, by the way, made the payments

15   not from his active company, Mingmen.  He made the payments

16   from two dormant companies to conceal those payments.

17        Mr. Mayzenberg concealed everything about this

18   scheme.  Those payments were made from dormant companies that

19   didn't actively provide any services to patients, yet he had

20   Mingmen Acupuncture as an active company but he didn't want to

21   have Mingmen pay for the patients.  He had his dormant

22   companies pay these shell companies that are associated with

23   Igor and Tamilla Dovman.  Those companies don't exist.  Those

24   companies don't provide marketing and advertising services.

25   Those companies are shell companies by everyone's account.

**SPA11**

11

1    There's no debate about that.

2           Mr. Mayzenberg, by the way, not only paid out of

3    these defunct dormant companies.  When asked, in interrogatory

4    responses, who did you use for marketing and advertising in

5    this case, he said no one, because he didn't pay marketing and

6    advertising expenses.  He paid kickbacks for patient referrals

7    that he actively concealed over the course of years.

8           So while he wants to now say it's his understanding

9    that he was paying marketing and advertising expenses, there's

10   no, not a single fact, not a single shred of paper, there's no

11   flyers, there's no advertisements, there's nothing that he can

12   point to that says, I believe I was paying for marketing and

13   advertising.  How can he believe that when the names of the

14   companies he was paying are ML Garbage Company, MN Surgical

15   Supply?  He couldn't have believed it.

16          In the context of fraud and RICO, I understand,

17   Your Honor, that we need to prove intent on those but, first

18   of all, we have claims for declaratory judgment and claims for

19   unjust enrichment where intent is not a consideration.  If we

20   talk about the claims where intent is a consideration, yes,

21   common law fraud and RICO, plaintiffs have to demonstrate

22   intent, but the law is well settled that intent, particularly

23   in the fraud arena, is not proven by direct evidence.

24   Mr. Mayzenberg is not going to stand up and tell the Court,

25   yes, you're right, I was paying kickbacks and I was lying to

**SPA12**

12

1  GEICO the whole time.

2          Fraud is proven through circumstantial evidence and

3  the evidence in here is overwhelming.  There's no other

4  conclusion that could be reached.  He just simply is saying

5  it's his understanding after lying in his interrogatory

6  responses, after paying monies out of concealed bank accounts,

7  after paying companies in the way he did by giving checks to

8  complete strangers which he claims he never knew who they

9  were, by writing checks that have blank memo lines, you know,

10  this practice and procedure, everything about it, it's beyond

11  raising any genuine issue for trial.

12          THE COURT:  How has your claim established that the

13  payments were for referrals and for nothing else?  How do you

14  make that connection?

15          MR. SIRIGNANO:  Mr. Mayzenberg repeatedly testified,

16  it's undisputed, that he made those payments only for one

17  reason:  That patients were sent to the clinics.  He

18  specifically said that if patients were not sent to the

19  clinics, I would not pay those companies.  And if patients

20  stopped being sent to the clinics by certain of the companies,

21  he testified, I stopped paying those companies.  Now, again,

22  he's saying it's his understanding that those were marketing

23  and advertising payments, but all accounts demonstrate it was

24  a direct payment for a patient referral.

25          Now, I also asked Mr. Mayzenberg at his deposition

**SPA13**

13

1   to identify, how did he keep track of which patients were sent

2   in connection with which payments.  He said, I don't keep

3   track, I can't tell you, I have no records.

4          Well, you would think that someone who's paying

5   marketing and advertising expenses, first, would want to get

6   an invoice from one of the companies.  He never got an

7   invoice.  Second, you would want to see, see an advertisement

8   or a flier, something that they did.  They didn't give him any

9   of that.  He got nothing, zero, except his testimony is that,

10  I got sent patients.

11         So while I can't tell you which particular patient

12  was sent when, there is no dispute that Mr. Mayzenberg made

13  these payments and got patients sent to the clinics.

14         THE COURT:  Excuse me.

15         The services that were being billed for were for

16  acupuncture, is that right?

17         MR. SIRIGNANO:  Yes, Your Honor.

18         THE COURT:  Who was providing the acupuncture

19  services?

20         MR. SIRIGNANO:  Not Mr. Mayzenberg.  Mr. Mayzenberg

21  is the record owner of Mingmen Acupuncture.  That's the

22  company that was billing GEICO for acupuncture services.

23  Mr. Mayzenberg hired what we call treating acupuncturists to

24  provide these services and then Mr. Mayzenberg, although he

25  didn't treat patients, he then, you know, billed GEICO for

**SPA14**

14

1   those services.

2          THE COURT:  Now, people came to Ming -- not "Ming"

3   but Mingmen.  Did they come to Mingmen?

4          MR. SIRIGNANO:  Yes, they went to Mingmen

5   Acupuncture.

6          THE COURT:  And who performed those services,

7   acupuncturists, certain independent contractors?

8          MR. SIRIGNANO:  We believe they're independent

9   contractors.  There's a dispute over that and I'll grant a

10  factual dispute as to whether they're actual W-2 employees of

11  Mingmen or they're independent contractors, but some treating

12  acupuncturist performed the services or allegedly performed

13  the services.

14         THE COURT:  Now, persons came to Mingmen for

15  acupuncture services?

16         MR. SIRIGNANO:  Yes.

17         THE COURT:  Did he indicate how it is that they came

18  there, who sent them there?

19         MR. SIRIGNANO:  No.  We asked Mr. Mayzenberg

20  repeatedly about all the payments to all of these different

21  companies that didn't do any advertising and marketing --

22         THE COURT:  Excuse me.  Excuse me.

23         When you say all of the different companies,

24  somebody comes to Mingmen for acupuncture services.  Does

25  anybody ask:  How did you get here?  Who are you?  Who

CMH        OCR        RMR        CRR        FCRR

**SPA15**

15

1  referred you?  What brings you here?  Did anybody ask that

2  question?

3          MR. SIRIGNANO:  Mr. Mayzenberg says no.

4          THE COURT:  Was Mr. Mayzenberg there when these

5  people were provided services?

6          MR. SIRIGNANO:  I asked Mr. Mayzenberg if he had any

7  records or if there was any way to tell how these patients got

8  to the clinics and he said no.

9          THE COURT:  Was Mr. Mayzenberg present at Mingmen or

10 was he absent?

11         MR. SIRIGNANO:  He was not present on a daily basis

12 but he claims to be the sole owner of Mingmen.  He claims to

13 have gone to the locations.  He claims to be in charge of the

14 management and operations of Mingmen.  He claims to be the

15 owner.

16         THE COURT:  Now, a person comes to Mingmen for

17 acupuncture services and services are provided by an

18 acupuncturist, is that right?

19         MR. SIRIGNANO:  Well, for purposes of this motion,

20 we're conceding that.  I mean, that's another issue but, yes,

21 acupuncture services are allegedly provided by the treating

22 acupuncturists and then a bill is generated and sent to GEICO

23 for those services.

24         THE COURT:  All right.  Now, what happens

25 thereafter?  Somebody, Mingmen or Sanli or Laogong or whoever

16

1   it is, then gets money from Mayzenberg?

2           MR. SIRIGNANO:  Unfortunately, Your Honor, it's not

3   that simple because of the deception and concealment.  We have

4   tried over the course of years to get specifics about how the

5   patient referral system worked and we don't know if

6   Mr. Mayzenberg was paying for patient referrals after the

7   patients came or whether it was in advance of the patients

8   being referred to the clinic.  There's somewhat confusion on

9   that.

10          THE COURT:  Who was he paying?  Who are the checks

11  being paid to?

12          MR. SIRIGNANO:  The checks were being paid to a

13  series of companies that we call the Dovman shell companies.

14  These are a series of companies that listed either Igor Dovman

15  as the president or Tamilla Dovman as the president and those

16  companies had no actual operations and they had different

17  names and they had different names for a reason.  He was

18  paying a whole series of these companies:  Crick Medical

19  Testing, ML Garbage Removal, MN Surgical Supplies, Robert

20  Consulting, Trim VR Services.  There's a whole list of

21  companies that Mr. Mayzenberg would pay, as he said, to send

22  patients to the clinic.

23          He testified specifically, when I asked him about ML

24  Garbage Removal, that company, I said why are you paying a

25  company called ML Garbage Removal for referrals of patients.

CMH        OCR        RMR        CRR        FCRR

**SPA17**

17

1  He said, I will pay any company, I will pay a garbage company,

2  as long as the garbage company refers patients to my clinics,

3  I will pay them.  That's what he said.

4          So I can't give you specifics but I know he knows he

5  paid these companies for patient referrals.

6          THE COURT:  Now, am I understanding that there is a

7  deposition at which Mr. Mayzenberg was asked why have you paid

8  X dollars to Y company and he said because they referred

9  patients to him?

10         MR. SIRIGNANO:  Yes.  He said, I will pay any

11 company that sends patients to my clinics.  That's what he

12 said.

13         Then he characterized -- during the same deposition,

14 he then characterized it, well, I'm -- they must be providing

15 advertising and marketing services.  Then I said, Well, what

16 advertising and marketing services?  He said, It must be

17 flyers.  I said, Do you have any of those?  No.  You've been

18 making these payments over the course of two years, you paid

19 $389,000 over the course of two years to a series of 13

20 different companies, do you have a single piece of paper

21 showing anybody performed marketing and advertising services?

22 No.  Did you ever get an invoice from any one of these

23 companies saying they provided services to you?  No.  Why did

24 you pay them, Mr. Mayzenberg?  Because they sent patients to

25 my clinics.

**SPA18**

18

1          THE COURT:  Now, you made some observation that

2      payments were being made directly and indirectly.  What were

3      the indirect payments?  How did that come about?

4          MR. SIRIGNANO:  No, Your Honor.  I made reference to

5      the New York State education law which is the statute, one of

6      the statutes, there's a number of them, that prohibits paying

7      for patients.  That statute, by its own language, makes it --

8      it prevents providers from making payments and the term is

9      payments directly or indirectly for patient referrals.  And I

10     think what that statute is intended to do is to actually

11     address the type of behavior that Mr. Mayzenberg is engaging

12     in.

13          He's saying, Well, wink, wink, it's for marketing

14     and advertising, but we know if it's not a direct payment for

15     a patient referral, it's clearly an indirect payment.  That's

16     what the New York statute is saying, that you can't make a

17     payment for a patient referral.  You can't even offer to make

18     a payment for patient referral.  That's what the education law

19     says.  And those payments, whether they're made for a direct

20     patient referral or indirect patient referral, are still

21     prohibited under the law.

22          THE COURT:  Is there anything else?

23          MR. SIRIGNANO:  Just quickly, I wanted to mention

24     the Igor Dovman and Tamilla Dovman portion of it because I

25     think Igor Dovman, who is the other main defendant in this

**SPA19**

19

1   case who supposedly was providing the marketing advertising

2   services, he pled the Fifth Amendment and he refused to

3   respond to any of the substantive allegations in the

4   complaint.  And under the law, an adverse inference, a

5   negative inference should be drawn against the other parties

6   to this case, Mr. Mayzenberg and Tamilla Dovman.

7          Under U.S. v. LiButti, the critical question is

8   whether that negative inference is trustworthy under the, you

9   know, for the search of truth.

10          Here, if you look at all the ample evidence that we

11  have and the lack of any documentation, the fact that Mr. Igor

12  Dovman invoked the Fifth Amendment and concealed the fact that

13  he was getting all of these monies is significant evidence and

14  I think that, in addition to everything else, should add to

15  the weight of the evidence and the imposition of summary

16  judgment in plaintiff's favor against all of the defendants.

17          THE COURT:  How does Tamilla Dovman come into this

18  picture?

19          MR. SIRIGNANO:  Tamilla Dovman obviously is

20  Mister -- excuse me -- she's Mr. Dovman's wife.  She worked

21  out of the same Coney Island law office that Mr. Dovman worked

22  out of, as well as two personal injury lawyers who were the

23  ones involved in obviously handling automobile accident cases.

24  And Mr. Mayzenberg and his companies specialized in treating

25  individuals injured in automobile accidents.

**SPA20**

20

1    Now, at this law office, Tamilla Dovman now claims

2  to be just a paralegal, but she was there with her husband and

3  with these two other lawyers.

4    The one lawyer, David Feinerman, was disbarred for

5  improper conduct in connection with his clients' settlement

6  funds for a period of time.  He then got reinstated.

7    Another lawyer, Daniel Corley, invoked the Fifth

8  Amendment.  When we asked Mr. Corley were you involved in a

9  patient kickback scheme with the other defendants in this

10  case, he refused to answer it.  This is a lawyer admitted to

11  the State of New York.  Why would he have a reason other than

12  the fact that he's implicated in the patient kickback scheme?

13  He would have no reason to invoke the Fifth Amendment other

14  than the fact that he was aware of and guilty and involved in,

15  at that law office, the patient kickback scheme.

16    That's where Tamilla Dovman worked and she was at a

17  law office, Tamilla Dovman, with her husband, with these

18  lawyers.

19    The companies that I talked about that got the money

20  for Mr. Mayzenberg, there's a whole series of them, Tamilla

21  Dovman was the president of three of them.  Two of those

22  companies were directly paid monies by Mr. Mayzenberg.  Okay?

23  So she was getting monies as the president of shell companies.

24  These companies don't exist.  These companies have no

25  operations.  These companies provide no services.  Yet, she

**SPA21**

21

 1    was the president of those companies.  She also made transfers

 2    of funds to those companies.  She endorsed checks.

 3            Now, her liability in this case is just as a

 4    co-conspirator under RICO and under RICO, the conspiracy

 5    statutes, the co-conspirator doesn't have to commit all

 6    aspects of the fraudulent scheme.  They just have to have

 7    general knowledge of the scheme and commit portions of the

 8    act.  She clearly is a co-conspirator under RICO.  So that's

 9    her involvement.

10            Just for Your Honor's own information, when we moved

11    for summary judgment on these, you would think that Tamilla

12    Dovman would have some innocent explanations for her being

13    listed as the president of companies that don't have any

14    operations.  You would think she would have some instant

15    explanation as to why she was endorsing checks to these shell

16    companies, why she worked at this law office.  She submitted

17    nothing.  No affidavit.  She submitted no -- she didn't

18    dispute any of the material facts in our Rule 56 statement.

19    She didn't conduct any discovery in the case.  She wants to

20    bury her head in the sand and say I didn't know who was going

21    on.  She didn't want to know what was going on.

22            She purposely avoided trying to get involved in the

23    ultimate payments, but she was listed as president, she was

24    actively involved and she didn't give any explanation and

25    under those circumstances, you can't defeat a summary judgment

22

 1   motion just by saying, hey, I didn't know what was going on,

 2   period.

 3         So what we have, in summary, Your Honor, I'll sit

 4   down now, is that Mr. Mayzenberg's main defense in this case

 5   is I had an understanding that they were payments for

 6   marketing and advertising with no supporting back up.  Tamilla

 7   Dovman's defense to the summary judgment motion is I didn't

 8   know what was going on with no supporting facts or evidence.

 9         THE COURT:  Thank you.

10         MR. SIRIGNANO:  Thank you, Your Honor.

11         THE COURT:  Ms. Maylov, did you want to be heard on

12   behalf of your client?

13         MS. MAYLOV:  Yes, Judge.

14         THE COURT:  Please.

15         MS. MAYLOV:  Well, plaintiff's counsel just stated

16   here that Tamilla Dovman worked with Igor Dovman at his law

17   office and she testified at her deposition that she worked at

18   the law office of Daniel Corley and Mr. Feinerman.  Her

19   husband, as far as she knows, doesn't own a law office.  They

20   share the same building.  The law office is on the second

21   floor and Mr. Dovman rented space on the third floor of the

22   same building on Coney Island Avenue in Brooklyn.

23         The statement that she worked for her husband is a

24   just a pure insinuation by plaintiff's counsel.  She came to

25   the deposition.  Shy provided her income taxes in discovery.

**SPA23**

23

1  It shows where she worked, who she worked for and, yes, she

2  didn't know the answer to some questions, but she clearly

3  stated on the record that she wasn't involved in any scheme to

4  defraud GEICO.  She actually answered that question on the

5  record.

6        I mean, she is related to her husband, she's his

7  wife, but whether there's any conduct by Mr. Dovman that she

8  testified that she had no knowledge of doesn't make her a

9  party to conspiracy.  Actually, the attorneys that she worked

10  for, Mr. Corley and Mr. Feinerman, never had personally as an

11  attorney referred or paid a kickback to Mr. Mayzenberg or

12  otherwise from Mr. Mayzenberg to them for referral of

13  patients.  There is not one client of theirs who's a patient

14  of Mr. Mayzenberg as far as our understanding.  GEICO has not

15  provided any proof that there was kickback by these two

16  attorneys.

17        Now, the payments were made by Mr. Mayzenberg to

18  shell companies and we don't know what the payments were for

19  other than Mr. Mayzenberg's testimony that it is for

20  advertising and referral.  So there is no other proof that

21  it's a kickback scheme to defer GEICO.  So my client had

22  nothing to do with the defrauding of GEICO.  She hasn't billed

23  GEICO directly.  I don't know if she had the benefit of any

24  payments from the two or three companies that she's been a

25  president of and was a signatory on the bank account.  So her

**SPA24**

24

1   involvement in the scheme is not existent, Judge.

2           THE COURT:  What did these companies that she was

3   the president of do?  Did they have some function?  Did they

4   have some business?

5           MS. MAYLOV:  As far as my client testified, she had

6   some limited knowledge.  She didn't know what exactly

7   happened, she knew funds were put in and she knew other funds

8   were taken out by making payments to other companies.

9           THE COURT:  Who created these shell companies?

10          MS. MAYLOV:  I mean, I believe she did.  I believe

11  she was the president of the three companies.

12          THE COURT:  Who created the companies, she did?

13          MS. MAYLOV:  Yes.

14          THE COURT:  For what purpose?  She was a paralegal,

15  was she, at a law office?

16          MS. MAYLOV:  Yes.

17          THE COURT:  That was her primary job?

18          MS. MAYLOV:  It was her primary job.

19          THE COURT:  What was the purpose in creating a shell

20  company; the company's incorporation?

21          MS. MAYLOV:  Yes, they are.

22          THE COURT:  So she must have gone to a lawyer and

23  asked the lawyer to form a corporation for her, that she would

24  be the president of the company.  What was her purpose in

25  doing that?

**SPA25**

25

1          MS. MAYLOV:  Well, some of these companies were

2   created that she, as an independent contractor, could be paid

3   for the services she provided to attorneys.

4          THE COURT:  My question is what was the purpose for

5   the creation of these corporations which had no function

6   whatsoever except to be in existence.  What was her purpose?

7          MS. MAYLOV:  Well, I don't know what the purpose is

8   but it wasn't the purpose of defrauding GEICO.

9          THE COURT:  Did it have any purpose at all?  Did it

10  have any function at all?

11         MS. MAYLOV:  I can't answer that question today,

12  Judge.

13         THE COURT:  It received money?

14         MS. MAYLOV:  They have received money.

15         THE COURT:  From Mr. Mayzenberg?

16         MS. MAYLOV:  Some of these companies, yes.

17         THE COURT:  And did Mr. Dovman inquire as to why

18  Mr. Mayzenberg was sending her company money?  The checks were

19  going to her as the president of the company?

20         MS. MAYLOV:  Well, there was a referral for, you

21  know, advertisement and there was a payment for advertisement

22  according to Mr. Mayzenberg.

23         THE COURT:  Well, was Ms. Dovman in the advertising

24  business or was she a paralegal?

25         MS. MAYLOV:  She was a paralegal.

**SPA26**

26

1          THE COURT:  And she was being paid for advertising

2   services?

3          MS. MAYLOV:  I can't answer that question, Judge.

4          THE COURT:  Is there anything else you would like to

5   say to me?

6          MS. MAYLOV:  No.  Thank you.

7          THE COURT:  Thank you very much.

8          Mr. Conroy?

9          MR. CONROY:  Thank you, Your Honor.

10         I'm going to make reference to an exhibit to the

11  plaintiff's motion for summary judgment and I've taken the

12  liberty of making a larger photocopy of part of their expert's

13  report and I have a copy for Your Honor if you can't clearly

14  see this one.  I'd be happy to hand it up.

15         THE COURT:  What is the purpose of this?  What's the

16  relevance of this?

17         MR. CONROY:  Your Honor, this is a flow chart that

18  describes the scheme to defraud as alleged by GEICO and as set

19  forth in GEICO's forensic accountant's expert report and it

20  purports to show the flow of money from Mingmen, the treating

21  acupuncture PC, to Dr. Mayzenberg and then on to

22  Dr. Mayzenberg's other companies, Sanli and Laogong, and then

23  to the Dovman shell entities.

24         My issue in this case and the basis for my motion

25  and my opposition to the plaintiff's motion is the last

**SPA27**

27

1   segment of the flow chart where it shows money going from the

2   Dovman shell entities to the patients or for the referral of

3   patients and what I submit to Your Honor is that there is no

4   evidence, there is just an absence of evidence as to what the

5   kickback scheme was.  It's GEICO's burden.  It's their case.

6   They can't even explain or allege what the kickback scheme is.

7   They just say we paid Dovman for the referral of patients.

8           Over the course of eight years --

9           THE COURT:  Excuse me.

10          MR. CONROY:  Yes, Your Honor.

11          THE COURT:  As I understand it, Counsel has said

12   that Mr. Mayzenberg was asked whether he paid these shell

13   companies for the referral of patients and Mr. Mayzenberg said

14   yes.  That's what I thought I heard the attorneys say.  And

15   apparently that's in response to a deposition question and

16   answer.

17           MR. CONROY:  Your Honor, that section of the

18   deposition, Mr. Mayzenberg is answering questions about his

19   belief he was paying monies for advertising and marketing.  He

20   specifically said he never engaged in any kickback scheme.

21           The general motion that plaintiffs have put forth is

22   that any payment to any person of any formula results in a

23   patient going to a medical practice is in the form of a

24   kickback and that is a gross oversimplification in a broad

25   brush stroke to say that all monies paid constitute kickbacks.

**SPA28**

28

1    That's simply not the case.

2            A kickback, as we understand it, you can pay

3    directly to a patient.  That's a kickback.  Pay a runner,

4    that's a kickback.  Paying the attorney to bring that patient,

5    that could be a kickback.  The plaintiffs don't say what are

6    the Dovman shell entities doing with this money.  Are they

7    paying lawyers, patients, runners, other doctors?  There's no

8    evidence of where the money goes after Dovman.  There's none.

9            There were 1,3398 patients that were treated by the

10   Mayzenberg PC's.  GEICO has access to all of these people and

11   they spoke to many of them.  There's not one statement about

12   one patient about why they were treated at Mayzenberg clinic.

13   There's no evidence that any lawyer sent them, that any lawyer

14   sent them, that Dovman sent them, that they were paid money.

15   There's no evidence whatsoever.  This is a fiction.

16           I agree that three-quarters of it gets filled out.

17   I don't dispute the fact that the money was paid from Mingmen

18   to Mayzenberg to Sanli and then it made its way to the Dovman

19   shell entities, but there's simply no evidence that any of

20   this money went specifically for the referral of any GEICO

21   patient.  What GEICO is trying to do is take one line from

22   Mr. Mayzenberg's deposition and say he admitted, he admitted

23   that these payments were for the referral, the illicit or

24   illegal referring.

25           Mr. Mayzenberg does not speak English as a first

**SPA29**

29

1  language.  He's of Ukranian descent.  He says, I paid money

2  for the patients, to get the patients, but at the same time

3  says through marketing and advertisement.  In his mind, in his

4  words, as it shows up in the deposition transcript, when I pay

5  money for advertisement, that means my patient come to my

6  clinic.  That's a very different situation from paying a

7  runner, paying a lawyer, paying someone to illegally refer or

8  to accept a kickback for referral of the patient.  That really

9  specifically is what this case at this stage is about.

10       I would also point out that on the issue of the

11  negative impulse, LiButti actually had several factors as to

12  whether or not it's appropriate to imply negative inference

13  from one party against other parties and those four factors do

14  not fall in favor of GEICO in this case.

15       There's virtually no evidence that Mr. Mayzenberg

16  and Mr. Dovman even knew each other.  There is scant

17  communication between then at any one time in time.  There are

18  checks being made out to these companies but Mr. Mayzenberg

19  testified that did he not know Mr. Dovman and that this was

20  just an arrangement that came through one of the clinics and

21  he left the checks blank and someone filled in the names.

22       THE COURT:  Excuse me.  An arrangement came through

23  one of the clinics?  What clinic are you referring to?

24       MR. CONROY:  Mayzenberg's PC operated out of

25  different locations.  Two of them were in Brooklyn.  One of

**SPA30**

30

1    them was in the Bronx.  It could have been the three that were

2    in Brooklyn.

3             THE COURT:  Who provided the acupuncture services at

4    these various clinics?

5             MR. CONROY:  The employee acupuncturists of the

6    PC's.

7             THE COURT:  They were employees?

8             MR. CONROY:  They were employees, K2.  He hired

9    them.  He paid them on W-2.  Some of them were paid beyond the

10   W-2s for what he described as other services for which he paid

11   them through his other PCs, but they were payroll, salaried

12   payroll of those PCs.

13            THE COURT:  I thought I heard that Mr. Mayzenberg

14   had made somewhere in the neighborhood of

15   300 some-odd-thousand dollars from these various shell

16   companies, is that right?

17            MR. CONROY:  Over the period of roughly 18 months.

18            THE COURT:  He paid 300-some-odd-thousand-dollars?

19            MR. CONROY:  I believe it's 389,000 to a series of

20   companies.

21            THE COURT:  And was Mr. Mayzenberg's explanation

22   that some $300,000 was paid for marketing services?

23            MR. CONROY:  Marketing.

24            THE COURT:  What does marketing mean?  What does

25   marketing mean?  What was he paying for that he would say was

**SPA31**

31

1   for marketing?

2          MR. CONROY:  I would -- I don't believe that there

3   is evidence in the summary judgment.

4          THE COURT:  I'm not asking about evidence.  I'm

5   asking you, sir.

6          MR. CONROY:  What I believe marketing activities

7   would be?

8          THE COURT:  What did Mr. Mayzenberg understand that

9   he was paying for in terms of marketing?

10          MR. CONROY:  Marketing a practice or clinic

11   location.

12          THE COURT:  He was paying these shell companies for

13   marketing 300 some-odd-thousand-dollars in a period of

14   18 months.  Is that what I'm hearing?

15          MR. CONROY:  Your Honor, $389,000 sounds like a lot

16   of money and it is, but in the context of companies like

17   these, these are --

18          THE COURT:  I'm sorry.  How did Mr. Mayzenberg get

19   to know these shell companies?  How did that come about?

20          Did they solicit Mr. Mayzenberg for business and

21   say, Mr. Mayzenberg, we will advertise your acupuncture

22   clinics for you?

23          And by the way, is there some prohibition, legal

24   prohibition for medical providers to pay for advertising for

25   patients?  Is this something --

**SPA32**

32

1          MR. CONROY:  Your Honor, if you ask GEICO, they

2     would certainly say that's prohibited as a kickback.

3          THE COURT:  I'm asking you.

4          MR. CONROY:  I'm telling that you there isn't.

5          THE COURT:  There is not?

6          MR. CONROY:  There is not.  There is what amounts to

7     be a disciplinary rule that prohibits direct or indirect

8     patient referral payments and that is codified as 8NYCRR29.1.

9     That statute has been on the books a very long time.

10          There is virtually no case law on this statute of

11     any kind and there is a, I believe either an Education

12     Department or an Insurance Department opinion letter about

13     this that is roughly 30 years old that is contained in the

14     plaintiff's motion which essentially says -- we were asked a

15     question, we're going to give a general answer.

16          The question was is it a violation of the

17     anti-referral statute to pay a medical referral service,

18     entities, to list the medical provider to a geographic area of

19     potential patients.  The opinion letter goes on to describe

20     instances where they believe it would be or wouldn't be a

21     violation and what they conclude in that letter is that unless

22     the patient is being paid, it would not be a violation if you

23     listed in the medical referral service marketing arrangement.

24          THE COURT:  All right.  Mr. Mayzenberg --

25          MR. CONROY:  This is what the plaintiff relies on to

**SPA33**

33

 1   make this case.

 2           THE COURT:  Mr. Mayzenberg paid somewhere in the

 3   neighborhood of $390,000 to a number of companies for

 4   advertising.  Let's leave marketing out for a moment.

 5           Did Mr. Mayzenberg have any sample of what it was

 6   that was being advertised that they provided to

 7   Mr. Mayzenberg?

 8           MR. CONROY:  He did not.

 9           THE COURT:  With copies of the advertisements that

10   he was paying for?

11           MR. SIRIGNANO:  He did not.

12           THE COURT:  And so he was paying

13   390 some-odd-thousand dollars for advertising that he never,

14   never asked for, never provided to him.

15           Now, Mr. Mayzenberg was paying these collections to

16   companies that he had no other relationship with in terms of

17   services except marketing and advertising?

18           MR. CONROY:  In fairness, Your Honor, Mr. Mayzenberg

19   actually left checks that were filled out, where the dollar

20   number was filled out and he signed the check, but someone

21   else filled in the payer portion of the check.

22           THE COURT:  You mean the payee?

23           MR. CONROY:  I'm sorry.  The payee, correct.

24           THE COURT:  Who did that?

25           MR. CONROY:  Well, the evidence in the record would

34

 1   indicate that most of the payee lines were filled in by

 2   Equaduct and I have no handwriting expert to contradict that.

 3            THE COURT:  Did Tamilla Dovman?  Did Tamilla Dovman

 4   fill out the payee line?

 5            MR. CONROY:  I'm not aware of any evidence to

 6   suggest that.

 7            THE COURT:  And were these checks endorsed?  They

 8   would be endorsed for purposes of being deposited?

 9            MR. SIRIGNANO:  I'm fairly confident saying that the

10   checks were endorsed.

11            THE COURT:  By?

12            MR. CONROY:  Your Honor, at this point, I'm drawing

13   my memory of the plaintiff's second expert report which I did

14   not rebut, but my understanding of the report in general is

15   there was fairly detailed evidence that the checks had Igor

16   Dovman's handwriting on them.  I don't believe Tamilla

17   Dovman's handwriting appeared on any of the checks and I'm

18   fairly confident that Mr. Mayzenberg never filled out any of

19   the payee portions of those checks.  But as to what the

20   specific endorsements on the back of those checks were, I

21   cannot speak, speak with accuracy on that.

22            THE COURT:  Well, Mr. Mayzenberg was preparing,

23   signing blank checks to be paid, filled out by somebody who he

24   didn't know who was going to fill in the payee but he was

25   assuming that it was for advertising services?

35

 1          MR. CONROY:  Yes.

 2          THE COURT:  Yes?

 3          MR. CONROY:  That's correct.

 4          THE COURT:  Thank you very much.

 5          Is there anything else?

 6          MR. CONROY:  That's it.

 7          THE COURT:  Thank you.

 8          Is there anything further?

 9          MR. SIRIGNANO:  I guess very briefly, Your Honor,

10   two things on the law.

11          First, monies paid for passive marketing advertising

12   are perfectly legitimate and the opinion letter that

13   Mr. Conroy references does indicate that, but it also makes

14   clear that payments that are intended for referrals and

15   recommendations by a for-profit entity are prohibited under

16   the New York Public Health Law.  So there's a difference

17   between, you know, a passive advertisement and actively

18   sending patients to clinics.

19          And Mr. Mayzenberg didn't say it was passive

20   advertising.  He said it was to send patients to clinics.  He

21   said if garbage removal company can find people, people and

22   garbage there and send them to the clinic, I don't care how

23   garbage companies are called.  Another question:  So this

24   company Green BH was able to generate more patients for your

25   practices?  I think so.

**SPA36**

36

1          THE COURT:  Who were the payees named in these

2    checks?

3          MR. SIRIGNANO:  There's a series of shell companies

4    and there is more than 15 of them and as I mentioned before,

5    Your Honor, the names of those companies include companies

6    like JER -- this one was the only advertising company -- JER

7    Advertising and Consulting.  There's Green BH, Inc., there's

8    Cornell Plus Inc., there's Crick Medical Testing, there's ML

9    Garbage Removal, there's MN Surgical Supply, Rig Testing, and

10   a whole series of other companies.

11         THE COURT:  And those payees' names were not filled

12   in by Mayzenberg but the checks were prepared in blank and

13   then the payee's name was filled in by some person?

14         MR. SIRIGNANO:  Correct.  And he got a call from

15   someone he didn't know to actually pick up the checks.  So the

16   whole thing, there's just no actual evidence or even a shred

17   of evidence that suggests that any kind of marketing and

18   advertising was performed.

19         THE COURT:  Thank you very much.

20         MR. SIRIGNANO:  Thank you, Your Honor.

21         THE COURT:  All right.  Thank you.  Thank you very

22   much.

23         MR. CONROY:  Thank you, Your Honor.

24         MR. SIRIGNANO:  Thank you, Your Honor.

25         (Matter concluded.)

**SPA37**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, ET AL.,

|                                  |                        |
|----------------------------------|------------------------|
| Plaintiffs,                      | MEMORANDUM AND ORDER   |
|                                  | 17-CV-2802             |
| - against -                      |                        |

IGOR MAYZENBERG, ET AL.,

                        Defendants.
----------------------------------------------------------x
**GLASSER**, Senior United States District Judge:

       Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company (collectively, "GEICO") alleged eight causes of action in their Amended Complaint. ECF No. 48, at 43–54. The Court, in its Memorandum and Order of August 24, 2022, granted summary judgment in GEICO's favor on five causes of action and dismissed a sixth, leaving two undecided. ECF No. 148, at 27–28. The Court also referred this case to Magistrate Judge Bloom for a report and recommendation on prejudgment interest and attorneys' fees that the Court might award to GEICO. *Id.* at 28. On August 30, 2022, GEICO informed the Court that it no longer seeks attorneys' fees or prejudgment interest and asked the Court to direct entry of final judgment. ECF No. 149. The Court declined to do so because two causes of action remained undecided. ECF No. 150. Now, GEICO moves jointly with some but not all of the defendants—Igor Mayzenberg, Sanli Acupuncture, P.C., Mingmen Acupuncture Services, P.C., and Laogong Acupuncture, P.C. (the "Mayzenberg Defendants")—to dismiss without prejudice the undecided causes of action, which are for common law fraud and unjust enrichment against Igor Mayzenberg and Sanli Acupuncture, P.C. ECF No. 151.

**SPA38**

A plaintiff may voluntarily dismiss a claim without a court order only (i) "before the opposing party serves either an answer or a motion for summary judgment," or (ii) later, if armed with "a stipulation of dismissal signed by all parties who have appeared . . . ." Fed. R. Civ. P. 41(a)(1)(A). Otherwise, a claim may be dismissed only by court order and "on terms that the court considers proper." Fed. R. Civ. P. 41(a)(2). "Rule 41(a)(2) dismissals are at the district court's discretion . . . ." *Paysys Int'l, Inc. v. Atos IT Servs. Ltd.*, 901 F.3d 105, 108 (2d Cir. 2018). A plaintiff will be "afforded an opportunity to withdraw its Rule 41(a)(2) motion to dismiss" if a district court "convert[s] a requested dismissal without prejudice to one with prejudice." *Id.*

Here, the joint motion to dismiss is governed by Fed. R. Civ. P. 41(a)(2) because it is not joined by two defendants who have appeared: Igor Dovman and Tamilla Dovman. *See* Fed. R. Civ. P. 41(a)(1)(A)(ii). However, neither Dovman is the subject of either cause of action which GEICO and the Mayzenberg Defendants have moved to dismiss. Accordingly, the Court grants their motion to dismiss GEICO's seventh and eighth causes of action, without prejudice.

Further, the Court rescinds as moot its referral of this case to Magistrate Judge Bloom for a report and recommendation on attorneys' fees and prejudgment interest.

The Clerk of Court is instructed to terminate all pending motions in this case and to enter final judgment as proposed by the parties. *See* ECF No. 149-1.

SO ORDERED.

Dated: Brooklyn, New York
     September 6, 2022

/s/   *I. Leo Glasser*
I. Leo Glasser
Senior United States District Judge

2

**SPA39**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, ET AL.,

                        Plaintiffs,                      JUDGMENT
                                                      17-CV-2802-ILG

     v.

IGOR MAYZENBERG, ET AL.,

                        Defendants.
--------------------------------------------------------------X

       A Memorandum and Order of United States Distict Judge I. Leo Glasser, having been filed on September 6, 2022, directing the Clerk to enter final judgment as proposed by the parties; it is

       ORDERED and ADJUDGED that:

       1. GEICO shall recover from the Defendant Igor Mayzenberg damages in the amount $2,835,489.72 on its claims for violation of 18 U.S.C. §1962(c);

       2. GEICO shall recover from the Defendants, Igor Mayzenberg, Igor Dovman, Tamilla Dovman a/k/a Tamilia Khanukayev, Sanli Acupuncture, P.C. and Laogong Acupuncture, P.C., jointly and severally, damages in the amount of $2,835,489.72 on its claims for violation of 18 U.S.C. §1962(d); and

       3. GEICO shall recover from the Defendants, Mingmen Acupuncture Services, P.C., Igor Mayzenberg, Igor Dovman and Tamilla Dovman a/k/a Tamilia Khanukayev, jointly and severally, damages in the amount of $945,163.24 on its claims for common law fraud and aiding and abetting fraud.

       This judgment shall bear post-judgment interest at the judgment rate from the date of entry until paid.

**SPA40**

Dated: Brooklyn, New York              Brenna B. Mahoney
      September 8, 2022              Clerk of Court

                                 By:     */s/Jalitza Poveda*
                                       Deputy Clerk



ATTORNEYS AT LAW

**W W W . R I V K I N R A D L E R . C O M**

926 RXR Plaza
Uniondale, NY 11556-0926
T 516.357.3000 F 516.357.3333

**STEVEN T. HENESY**
PARTNER
(516) 357-3308
steven.henesy@rivkin.com

September 13, 2022

<u>**Via ECF**</u>
Honorable Judge I. Leo Glasser
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

  **Re:**    *Government Employees Ins. Co., et al. v. Mayzenberg, et al.*
             Case No. 1:17-cv-02802-ILG-LB

Dear Judge Glasser:

As the Court is aware, we represent Plaintiffs Government Employees Insurance Company,
GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty
Company (collectively "Plaintiffs" or "GEICO") in the above-referenced matter. We write to
respectfully request that the Court direct the Clerk of the Court to issue an amended Final Judgment
– *nunc pro tunc* to the entry date of the original Final Judgment – to correct what appears to have
been a clerical error omitting reference to Plaintiffs' declaratory judgment claim.

On August 30, 2022, Plaintiffs filed an application for entry of Final Judgment in accordance with
the Court's August 24, 2022 Memorandum and Order granting in part and denying in part
Plaintiffs' motion for summary judgment. *See* ECF No. 149. As part of Plaintiffs' August 30
application, we submitted a proposed Final Judgment entering judgment on the claims for which
Plaintiffs were granted summary judgment and awarded damages – namely, Plaintiffs' RICO,
RICO conspiracy, common law fraud, and aiding and abetting fraud claims. *See* ECF No. 149-1.
The proposed Final Judgment also proposed to enter judgment on Plaintiffs' claim for a declaratory
judgment, to the effect that Plaintiffs were not obligated to remit payment on Defendant Mingmen
Acupuncture Services, P.C.'s pending no-fault insurance claims. *See id.*, p. 2.

On September 6, 2022, the Court directed the Clerk of the Court to, among other things, "enter
<u>*final judgment as proposed by the parties See ECF No. 149-1.*</u>" *See* ECF No. 152 (emphasis
added). The Clerk of the Court entered Final Judgment on September 8, 2022. *See* ECF No. 153.
However, <u>the Final Judgment entered by the Clerk did not issue judgment on Plaintiffs' declaratory
judgment claim as the proposed Final Judgment had</u>. *See id.*

**SPA42**

Therefore, Plaintiffs respectfully request that the Court direct the Clerk of the Court to enter an amended Final Judgment to address Plaintiffs' declaratory judgment (in accordance with the proposed Final Judgment), and deem that amendment to be effective, *nunc pro tunc*, to September 8, 2022.

Plaintiffs have conferred with counsel for the Mayzenberg Defendants, who have indicated that they <u>consent</u> to this application.

We thank the Court for its time and continuing attention to this matter.

Respectfully submitted,

RIVKIN RADLER LLP

Steven T. Henesy

Cc:     All counsel of record (*via* ECF)

Granted.
SO ORDERED. 9/13/2022
/s/ I. Leo Glasser, U.S.D.J.

5983642.v1

**SPA43**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE COMPANY,
GEICO INDEMNITY COMPANY, GEICO GENERAL
INSURANCE  COMPANY and GEICO CASUALTY
COMPANY,

                              Plaintiffs,

        -against-

IGOR MAYZENBERG,
MINGMEN ACUPUNCTURE SERVICES, P.C.,
SANLI ACUPUNCTURE, P.C.,
LAOGONG ACUPUNCTURE, P.C.,
IGOR DOVMAN, and
TAMILLA DOVMAN a/k/a TAMILLA KHANUKAYEV,

                              Defendants.
-------------------------------------------------------------------X

Docket No.: 1:17-cv-02802-ILG-LB

## <u>AMENDED FINAL JUDGMENT</u>

A Memorandum and Order of the Honorable I. Leo Glasser, United States District Judge,

was filed on August 24, 2022, (i) granting in part and denying in part, the motion for summary

judgment of Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company, and GEICO Casualty Company (collectively, "Plaintiffs" or

"GEICO"), (ii) denying the motions for summary judgment of Defendants Igor Mayzenberg,

Tamilla Dovman a/k/a Tamilla Khanukayev, Mingmen Acupuncture, P.C., Sanli Acupuncture,

P.C. and Laogong Acupuncture, P.C., and (iii) denying Defendant Tamilla Dovman a/k/a Tamilla

Khanukayev's motion to dismiss.  **NOW**, on the application of Plaintiffs seeking final judgment

in this matter, it is hereby

**SPA44**

**ADJUDGED and DECLARED** that pursuant to 28 U.S.C. §§ 2201 and 2202, Defendant Mingmen Acupuncture Services, P.C. is ineligible for reimbursement from GEICO on all pending no-fault claims; and it is further

**ORDERED and ADJUDGED** that:

1.     GEICO shall recover from the Defendant Igor Mayzenberg damages in the amount $2,835,489.72 on its claims for violation of 18 U.S.C. §1962(c);

2.     GEICO shall recover from the Defendants, Igor Mayzenberg, Igor Dovman, Tamilla Dovman a/k/a Tamilia Khanukayev, Sanli Acupuncture, P.C. and Laogong Acupuncture, P.C., jointly and severally, damages in the amount of $2,835,489.72 on its claims for violation of 18 U.S.C. §1962(d); and

3.     GEICO shall recover from the Defendants, Mingmen Acupuncture Services, P.C., Igor Mayzenberg, Igor Dovman and Tamilla Dovman a/k/a Tamilia Khanukayev, jointly and severally, damages in the amount of $945,163.24 on its claims for common law fraud and aiding and abetting fraud.

This judgment shall bear post-judgment interest at the judgment rate from the date of entry until paid.

Dated: Brooklyn, New York
             NPT September 8, 2022

Brenna B. Mahoney
Clerk of Court

*August Marziliano*

By:  <u>August Marziliano</u>
       Chief Deputy Clerk

# SPA45

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| GOVERNMENT EMPLOYEES INSURANCE COMPANY, et al, ) ) ) ) | Civ. No. 17-CV-2802 |
| ) | |
| Plaintiffs, ) | Judge I. Leo Glasser |
| ) ) | |
| IGOR MAYZENBERG, ET AL., ) | |
| ) | |
| Defendants. ) | |

## NOTICE OF APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT FROM A JUDGMENT OR ORDER FOR THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK

NOTICE is hereby given that Defendants, Igor Mayzenberg, Mingmen Acupuncture, P.C. ("Mingmen"), Sanli Acupuncture, P.C. ("Sanli") and Laogong Acupuncture, P.C. ("Laogong") (collectively, the "Mayzenberg Defendants") in the above named case, hereby appeal to the United States Court of Appeals for the **Second Circuit** from Memorandum Opinion filed on August 24, 2022 (Docket No. 152) and the Amended Final Judgment dated September 8, 2022 and filed on September 14, 2022 (Docket No. 157) by the Honorable **I. Leo Glasser**, Judge of the United States District Court for the Eastern District of New York, which (1) granted Plaintiffs' motion for summary judgment, in part; and (2) denied Mayzenberg Defendants' motion for summary judgment."

Dated:  October 4, 2022
      Garden City, New York

                        Respectfully Submitted,

                        **SCHWARTZ CONROY & HACK PC**

By:  */s/ Matthew J. Conroy*
           Matthew J. Conroy
           666 Old Country Road, Suite 900
           Garden City, NY 11530
           Tel.:    (516) 745-1122
           Email:   mjc@schlawpc.com
           *Attorneys for Defendants Igor Mayzenberg, Mingmen Acupuncture, P.C, Sanli Acupuncture, P.C. and Laogong Acupuncture, P.C.*

**CERTIFICATE OF ELECTRONIC SERVICE**

On October 4, 2022, I caused to be served a true and correct copy of the foregoing document upon all counsel of record via the CM/ECF system.


DATED:      Garden City, New York
            October 4, 2022


_/s/ Matthew J. Conroy_
*Attorneys for Defendants Igor Mayzenberg, Mingmen Acupuncture, P.C, Sanli Acupuncture, P.C. and Laogong Acupuncture, P.C.*