# 22-2537-cv(L)
## 22-2685-cv(CON)

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

————◆ ◆◆————

GOVERNMENT EMPLOYEES INSURANCE COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY, GEICO CASUALTY COMPANY,

*Plaintiffs-Appellees,*

*v.*

IGOR MAYZENBERG, MINGMEN ACUPUNCTURE, P.C.,
SANLI ACUPUNCTURE, P.C., LAOGONG ACUPUNCTURE, P.C.,
TAMILLA DOVMAN, AKA TAMILLA KHANUKAYEV, IGOR DOVMAN,

*Defendants-Appellants,*

JOHN DOE,

*Defendant.*

—————————

*On Appeal from the United States District Court
for the Eastern District of New York*

## BRIEF FOR PLAINTIFFS-APPELLEES

Barry I. Levy
Michael A. Sirignano
Henry M. Mascia
Steven T. Henesey
RIVKIN RADLER LLP
*Attorneys for Plaintiffs-Appellees*
926 RXR Plaza
West Tower, 9th Floor
Uniondale, New York 11556
516-357-3000

## CORPORATE DISCLOSURE STATEMENT

Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company (non-governmental corporate parties) are directly and/or indirectly wholly owned subsidiaries of GEICO Corporation which is an indirectly wholly owned subsidiary of Berkshire Hathaway, Inc.

Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. There are no other individuals or entities whose citizenship is attributable to GEICO.

# **TABLE OF CONTENTS**

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ......................................................................v

STATEMENT OF THE CASE ....................................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...........................6

FACTUAL AND PROCEDURAL BACKGROUND ...........................................7

    A.   The Parties....................................................................7

    B.   New York No-Fault Laws....................................................9

    C.   Defendants' Fraudulent Scheme ............................................11

    D.   GEICO's Amended Complaint ................................................16

    E.   Competing Summary Judgment Motions ...................................18

        1.   GEICO's Motion for Summary Judgment .........................18

        2.   Defendants' Opposition and Motion for Summary Judgment ...............................................................20

    F.   District Court Order .........................................................22

    G.   Final Judgment ..............................................................25

SUMMARY OF ARGUMENT ..................................................................26

ARGUMENT ..................................................................................30

POINT I ...................................................................................30

THE DISTRICT COURT PROPERLY GRANTED GEICO
SUMMARY JUDGMENT DECLARING THAT MINGMEN
WAS INELIGIBLE FOR NO-FAULT BENEFITS BECAUSE
IT PAID KICKBACKS FOR PATIENT REFERRALS .................................30

    A.   General Legal Principles ......................................................30

    B.   Eligibility For No-Fault Benefits ........................................32

    C.   Mingmen Is Ineligible For No-Fault Benefits.....................34

        1.   GEICO Established That Mayzenberg Paid
            Kickbacks For Patient Referrals....................................34

        2.   Defendants Are Ineligible To Collect No-Fault
            Benefits Because The Payment Of Kickbacks Is
            A Licensing Violation ...................................................39

    D.   Defendants' Arguments On Appeal Lack Merit .................40

        1.   The Kickbacks Render Defendants Ineligible For
            No-Fault Benefits .........................................................40

        2.   GEICO Need Not Trace Each Kickback To A
            Specific Patient..............................................................49

        3.   The Only Reasonable Conclusion From This Record
            Is That Mayzenberg Paid Kickbacks For Patient
            Referrals ........................................................................51

POINT II ..................................................................................57

THE DISTRICT COURT PROPERLY GRANTED GEICO
SUMMARY JUDGMENT ON ITS' CLAIM UNDER
18 U.S.C. § 1962(C) AND ENTERED A JUDGMENT
AGAINST MAYZENBERG FOR $2,835,489.72 ..........................................57

    A.   General Legal Principles ....................................................57

B.   GEICO Established All Elements Of A Section 1962(C)
Violation ............................................................................... 57

C.   Defendants' Arguments On Appeal Lack Merit ................................ 59

POINT III ......................................................................................... 61

THE DISTRICT COURT PROPERLY GRANTED GEICO
SUMMARY JUDGMENT ON ITS FRAUD CLAIM AND
ENTERED A JUDGMENT AGAINST MAYZENBERG
FOR $945,163.24 ............................................................................ 61

A.   General Legal Principles ..................................................... 61

B.   The District Court Properly Entered Judgment Against
Mayzenberg On GEICO's Fraud Claim ............................................. 62

C.   Defendants' Arguments On Appeal Should Be Rejected ................... 63

CONCLUSION .................................................................................... 66

CERTIFICATE OF COMPLIANCE WITH FRAP 32(A) ..................................... 67

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re 650 Fifth Ave. & Related Properties*,
  830 F.3d 66 (2d Cir. 2016) ...............................................................56

*Alix v McKinsey & Co.*,
  23 F.4th 196, 203 (2d Cir.)
  *cert. denied*, 143 S. Ct. 302 (2022) ....................................................18

*Allstate et al. v. City Wide Health Facility, Inc. et al.*,
  1:21-cv-06509-MKB-RML ...............................................................16

*Allstate Ins. Co. v. Howell*,
  2013 WL 5447152 (E.D.N.Y. Sep't 27, 2013) ....................................60

*Allstate Ins. Co. v. Lyons*,
  843 F. Supp. 2d 358 (E.D.N.Y. 2012) ................................................63

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ...........................................................................31

*Andrew Carothers, M.D., P.C. v. Progressive Ins. Co.*,
  33 N.Y.3d 389 (2019) ...................................................................*passim*

*Azrielli v. Cohen Law Offices*,
  21 F.3d 512 (2d Cir. 1994) ................................................................57

*Cedric Kushner Promotions, Ltd. v. King*,
  533 U.S. 158 (2001).............................................................................58

*Cosmas v. Hassett*,
  886 F.2d 8 (2d Cir. 1989) ...................................................................61

*DeFalco v. Bernas*,
  244 F.3d 286 (2d Cir.),
  *cert. denied*, 534 U.S. 891 (2001).......................................................57

*Enzo Biochem, Inc. v. Johnson & Johnson*,
No. 87 Civ. 6125 (KMW), 1992 WL 309613
(S.D.N.Y. Oct. 15, 1992) ...............................................................61, 62

*In re Fosamax Prods. Liab. Litig.*,
707 F.3d 189 (2d Cir.),
*cert. denied*, 569 U.S. 1026 (2013)..................................................56

*Gallo v. Prudential Residential Servs., L.P.*,
22 F.3d 1219 (2d Cir. 1994) ............................................................31

*GEICO v. Alrof, Inc.*,
No. 11 Civ. 4028(SLR)(RER), 2013 WL 9600668
(E.D.N.Y. July 19, 2013) ..............................................................40, 59

*Gov't Employees Ins. Co. v. Badia*,
No. 13-CV-1720 (CBA)(MVS), 2015 WL 1258218
(E.D.N.Y. Mar. 18, 2015) .............................................................40, 59

*Gov't Employees Ins. Co. v. Jacques*,
No. 14 Civ. 5299(KAM)(VMS), 2017 WL 9487191
(E.D.N.Y. Feb. 13, 2017) ..............................................................40, 59

*Gov't Emps. Ins. Co. v. Cean*,
No. 19-CV-2363-PKC-SMG, 2019 WL 6253804
(E.D.N.Y. Nov. 22, 2019)..............................................................40, 59

*Gov't Emps. Ins. Co. v. Elmwood Park Med. Grp., P.C.*,
No. 21-CV-617 (FB) (RER), 2022 WL 772737
(E.D.N.Y. Feb. 23, 2022)...............................................................39, 59

*Gov't Emps. Ins. Co. v. Erlikh*,
No. 16-CV-7120-DLI-SJB, 2019 WL 1487576
(E.D.N.Y. Feb. 28, 2019)..............................................................40, 59

*Gov't Emps. Ins. Co. v. Landow*,
No. 21-CV-1440-NGG-RER, 2022 WL 939717
(E.D.N.Y. Mar. 29, 2022) ..............................................................39, 59

*Gov't Emps. Ins. Co. v. Relief Med., P.C.*,
554 F. Supp. 3d 482 (E.D.N.Y. 2021) .........................................39, 59

vi

*Gov't Emps. Ins. Co. v. Zaitsev*,
No. 1:20-CV-03495-FB-SJB, 2021 WL 3173171
(E.D.N.Y. July 27, 2021) ...............................................................39, 59

*Gov't Emps. Ins. Co. v. Zilberman*,
No. 1:20-CV-00209-FB-RML, 2021 WL 1146086
(E.D.N.Y. Mar. 25, 2021) ..............................................................39, 59

*Govt. Employees Ins. Co v Mayzenberg*,
17-CV-2802, 2018 WL 6031156 (E.D.N.Y. Nov. 16, 2018) ............................17

*Jeffreys v. City of New York*,
426 F.3d 549 (2d Cir. 2005) ..............................................................36

*LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*,
10 F. Supp. 3d 504 (S.D.N.Y. 2014) ..................................................63

*LiButti v. United States*,
107 F.3d 110 (2d Cir. 1997) ........................................................37, 38

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
13 F.4th 247 (2d Cir. 2021) ..............................................................30

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)...............................................................30, 31, 36

*Matter of Med. Socy. of State v Serio*,
100 N.Y.2d 854 (2003) ....................................................................47

*Metromedia Co. v. Fugazy*,
983 F.2d 350 (2d Cir. 1992),
*cert. denied*, 508 U.S. 952 (1993)....................................................58

*Patterson v. County of Oneida*,
375 F.3d 206 (2d Cir. 2004) ..............................................................55

*Perfect Dental, PLLC v. Allstate Ins. Co.*,
538 F. Supp. 2d 543 (E.D.N.Y. 2007) ................................................30

*Perl v. Meher*,
18 N.Y.3d 208 (2011) ......................................................................47

*Reves v. Ernst & Young*,
  507 U.S. 170 (1993)............................................................58

*Schlaifer Nance & Co. v. Estate of Warhol*,
  119 F.3d 91 (2d Cir. 1997) .................................................61

*Schwartz v. Newsweek, Inc.*,
  653 F. Supp. 384 (S.D.N.Y. 1986),
  *aff'd*, 827 F.2d 879 (2d Cir. 1987).....................................61

*Scott v. Harris*,
  550 U.S. 372 (2007)............................................................30

*Sellers v. M.C. Floor Crafters, Inc.*,
  842 F.2d 639 (2d Cir. 1988) ...............................................31

*Shields v. Citytrust Bancorp*,
  25 F.3d 1124 (2d Cir. 1994) ...............................................62

*Star Ins. Co. v. Hazardous Elimination Corp.*,
  2007 WL 316569 (E.D.N.Y. Jan. 30, 2007).....................31, 55

*State Farm Mut. Auto. Ins. Co. v. Mallela*,
  4 N.Y.3d 313 (2005) ....................................................*passim*

*State Farm Mut. Auto. Ins. Co. v. Metro Pain Specialists P.C.*,
  No. 21-CV-5523 (MKB), 2022 WL 1606523
  (E.D.N.Y. May 20, 2022) ...............................................39, 59

*U.S. S.E.C. v. Suman*,
  684 F. Supp. 2d 378 (S.D.N.Y. 2010),
  *aff'd*, 421 F. App'x 86 (2d Cir. 2011)................................38

*United States v. Certain Real Prop. & Premises
  Known as 4003-4005 5th Ave., Brooklyn, N.Y.*,
  55 F.3d 78 (2d Cir. 1995) ...................................................56

*United States v. Priv. Sanitation Indus. Ass'n of
  Nassau/Suffolk, Inc.*,
  44 F.3d 1082 (2d Cir. 1994) ...............................................31

*Variety Homes, Inc. v. Postal Life Ins. Co.*,
  287 F.2d 320 (2d Cir. 1961) ...............................................63

## Statutes and Other Authorities

8 N.Y.C.R.R. § 29 .................................................................................... 19

8 N.Y.C.R.R. § 29.1(b)(3) ................................................................. *passim*

11 N.Y.C.R.R. §65-3.11 .............................................................................. 9

11 N.Y.C.R.R. § 65-3.11 (a)-(b) ................................................................. 9

11 N.Y.C.R.R. § 65-3.16(a)(12) ........................................................ *passim*

18 U.S.C. §1341 .............................................................................. 57, 58

18 U.S.C. § 1961(1)(B) ......................................................................... 57

18 U.S.C. § 1961(4) ............................................................................. 57

18 U.S.C. § 1962(c) ...................................................................... *passim*

18 U.S.C. § 1962(c) and (d) ............................................................. 17, 25

18 U.S.C. § 1962(d) ............................................................................. 19

18 U.S.C. §1964(c) ............................................................................... 60

2004-40 N.Y. St. Reg. 12, 14 (Oct. 6, 2004) .................................... *passim*

Fed. R. Civ. P. 56(a) .............................................................................. 30

Fed. R. Civ. P. 56(c)(4) .......................................................................... 31

Fed. R. Civ. P. 56(e) .............................................................................. 30

N.Y. Business Corporation Law § 1507 ....................................... 11, 33, 47

N.Y. Education Law § 6509-a .......................................................... 11, 33

N.Y. Education Law § 6512 .............................................................. 11, 33

N.Y. Education Law § 6530(11) ........................................................ 11, 33

N.Y. Education Law § 6530(18) ...................................................... *passim*

N.Y. Education Law § 6530(19) ........................................................ 11, 33

N.Y. Insurance Law § 403 ............................................................. 9

N.Y. Insurance Law § 5102 (a) ..................................................... 9

N.Y. Insurance Law § 5102(a)(1) ............................................... 44

N.Y. Insurance Law § 5108 ..................................................... 9, 44

N.Y. Pub. Health Law § 230-a(4) ............................................... 41

N.Y. Pub. Health Law § 230-a(2)(4) ........................................ 10

N.Y. Pub. Health Law § 4501 ..................................................... 52

https://www.dfs.ny.gov/system/files/documents/2022/03/2021_health
_fraud_annual_rpt_20220303.pdf ....................................... 48

https://www.justice.gov/usao-sdny/pr/new-york-doctor-who-
performed-unnecessary-back-surgeries-part-trip-and-fall-fraud
(last visited June 16, 2023) ................................................... 48

https://www.justice.gov/usao-sdny/pr/new-york-lawyers-and-doctor-
sentenced-defrauding-new-york-city-area-businesses-and ................ 48

New York State Department of Financial Services, Office of General
Counsel Opinion No. 03-01-26 (January 13, 2003) ............................. 9

Report on Fee Splitting, Mar. 5, 2001 ............................................ 43, 44

New York Workers' Compensation Fee Schedule………..…………….Addendum

## STATEMENT OF THE CASE

Plaintiffs-Appellees Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company (collectively, "GEICO" or "Plaintiff") submit this brief in response to the appeal filed by Defendants-Appellants Igor Mayzenberg ("Mayzenberg"), Laogong Acupuncture, P.C. ("Laogong"), Sanli Acupuncture, P.C. ("Sanli") and Mingmen Acupuncture Services, P.C. ("Mingmen") (the "Defendants").

GEICO commenced this action to terminate a complex no-fault insurance fraud scheme designed to financially enrich the participants at the expense of the care and well-being of GEICO's Insureds. As part of that scheme, Defendants paid Igor Dovman and Tamilla Dovman (the "Dovmans") (among others) kickbacks in exchange for the referral of automobile accident victims, who were then subjected to excessive, unnecessary, and illusory acupuncture services that were billed to automobile insurers, including GEICO. Paying for patient referrals is a licensing violation under New York law, which prohibits licensed healthcare professionals from paying kickbacks for patient referrals and makes clear that violation of the law can result in the revocation of the professional's license. Healthcare providers who engage in such unlawful conduct are legally ineligible for payment under New York's no-fault system. The District Courts in this Circuit have routinely and

1

uniformly arrived at this conclusion, which was adopted by the District Court here, and should be affirmed on appeal.

In the context of New York no-fault, where accident victims generally have no responsibility to pay for healthcare they receive, kickbacks or other financial incentives paid to generate patient referrals create perverse incentives for professionals to exploit the patients by providing unnecessary services or treating patients according to predetermined protocols and to increase reimbursement sought from insurers on behalf of the patient for whom a payment was made and reduces the patient's available benefits. The facts of this case exemplify exactly how kickback payments -- here effectuated through shell companies and money laundering activity -- drive that behavior and compromise professional judgment.

The record demonstrates that Defendants paid for patients in violation of New York State's Education Law and Public Health law, making Mingmen (the professional entity used to bill insurers) ineligible to bill for or collect No-Fault benefits under New York's No-Fault laws and the New York Court of Appeals decision in *State Farm Mut. Auto. Ins. Co. v. Mallela*, 4 N.Y.3d 313 (2005). There is no genuine issue of material fact on this issue. Indeed, Defendants do not dispute that: (i) the payments from Defendants to the Dovmans were made, and (ii) the payments were made for the purpose of procuring patient referrals. To the extent Defendants have made any factual argument, it has been limited to after-the-fact,

2

conclusory, and implausible statements that the payments to a series of "shell" companies owned by the Dovmans, including companies with names such as *ML Garbage Removal, Inc., MN Surgical Supply, Inc., Best AC Medical Supply, Inc.,* and *Krik Medical Testing, Inc.,* were for supposed "marketing and advertising" services. The District Court correctly recognized that no rational juror could credit this "after the fact" testimony because Defendants previously had provided sworn interrogatory responses indicating that they had never paid anyone for marketing or advertising services, admitted to making the kickback payments during depositions, and were ultimately unable to provide any detail about the supposed "marketing and advertising" companies to which hundreds of thousands of dollars were funneled.

Igor Dovman did not even attempt to dispute the kickback and patient brokering scheme. Instead, he invoked his Fifth Amendment privilege when asked during his deposition whether payments he received from Defendants were kickbacks in exchange for patient referrals. Dovman also invoked the Fifth Amendment in responding to virtually every substantive allegation made against him in Plaintiffs' Amended Complaint, including that Defendants caused hundreds of thousands of dollars to be paid to the Dovman Shell Entities in exchange for patient referrals. When GEICO moved for summary judgment on its claims against Defendants, Dovman did not oppose that motion.

The kickback scheme at the center of this case does not differ in any meaningful way from the licensing violations deemed by the Court of Appeals in *Mallela* and *Carothers* to render professional entities ineligible for payment, where laypersons unlawfully controlled professional corporations by charging excessive fees for equipment and management "services". The kickback scheme here varies the classic *Mallela-Carothers* arrangement by slightly altering the method. Instead of overcharging for equipment and/or management services in connection with the professional entities' operation, the Dovmans charged Defendants for the patients, which allowed them to exert the same level of influence and control. Regardless of the method, the result is the same. The laypersons retain the power to manipulate the professional corporations, eroding professional standards, compromising patient care, and undermining New York law. The cause and effect illustrated here is simple: (i) no payments, no patients, and (ii) without patients, no ability to bill and collect from New York automobile insurers. Considering New York law and the corresponding public policy, the District Court properly found that Defendants were ineligible to collect No-Fault benefits, and correctly entered a declaratory judgment in GEICO's favor to that effect.

The District Court also properly granted GEICO summary judgment on its RICO claim, 18 U.S.C. § 1962(c), and entered a judgment against Mayzenberg for $2,835,489.72. GEICO established all elements of its claim. Defendants'

contention on appeal that GEICO needed to trace each kickback to a specific patient is wrong.  New York law makes clear that a healthcare provider that pays or receives kickbacks in exchange for patient referrals operates in violation of New York's licensing requirements, and therefore lacks any entitlement to collect No-Fault Benefits in connection with any of its claims.  Thus, GEICO was entitled to recover treble damages and was properly awarded judgment of $2,835,489.72.

Finally, the District Court properly granted GEICO summary judgment on its common law fraud claim and entered a judgment against Mayzenberg for $945,163.24.  GEICO established that the kickback scheme here involved a material misrepresentation or omission of fact by Mingmen regarding its eligibility for benefits, made with knowledge of its falsity, reasonable reliance on the part of GEICO, and causally related damages in the form of benefits paid to an ineligible professional entity.  Accordingly, the District Court properly entered judgment in favor of GEICO on its fraud claim against Mayzenberg for $945,163.24.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Did the District Court properly issue a declaratory judgment that Mingmen was ineligible for No-Fault Benefits because the Defendants paid kickbacks for patient referrals.

Yes.

2. Did the District Court properly grant GEICO summary judgment on its claim under the RICO statute, 18 U.S.C. § 1962(c), and properly enter a judgment against Mayzenberg for $2,835,489.72?

Yes.

3. Did the District Court properly grant GEICO summary judgment on its fraud claim and properly enter judgment against Mayzenberg and Mingmen for $945,163.24?

Yes.

## **FACTUAL AND PROCEDURAL BACKGROUND**

**A.**    **The Parties**

GEICO is a Nebraska corporation authorized to issue automobile insurance policies in New York.

Mayzenberg is a resident of Brooklyn, New York and licensed to practice acupuncture in New York (A38, A3136, A3213).[1] On February 2, 2000, Mayzenberg incorporated Laogong (A39, A3213). Laogong was dissolved by proclamation of the New York Department of State on July 28, 2010 (A40, A1555-A1557) and has not treated a patient since around 2012 (A40, A433-A434). Mayzenberg incorporated Sanli as an acupuncture professional corporation in 2001 (A38). Sanli last provided acupuncture services to patients in 2011 (A38, A100).

Mayzenberg incorporated Mingmen as an acupuncture professional corporation in 1998 (A38, A94). Mingmen provided acupuncture services to individuals involved in automobile accidents and eligible for no-fault insurance benefits ("Insureds") (A39, A98).

The Dovmans reside in Brooklyn, New York (A40, A803).[2] From 2014 to 2017, one of the Dovmans was listed as "president" and/or "owner" of at least

---

[1] Numbers preceded by the letter "A" and in parentheses refer to pages of the Joint Appendix.

[2] The Dovmans initially appeared but withdrew their appeals after settling with GEICO.

twenty-three different companies (the "Dovman Shell Entities") (A41, A1558). For each of the Dovman Shell Entities, one of the Dovmans was also listed as signatory on the company bank accounts but none identify Igor or Tamilla Dovman as the "incorporator" on the certificates of incorporation (A41, 45, A1558, A1837-A1885).

Rather, at least three of the Dovman Shell Entities listed an individual as "incorporator" who had no affiliation with the underlying company, and had not authorized anyone to list them on the certificate of incorporation (A43, A1816-A1898). For at least six of the Dovman Shell Entities, Dovman presented fake certificates of incorporation to open bank accounts in the names of those shell companies (A1886-1899). When asked whether he had incorporated companies to conceal an automobile insurance kickback and/or patient brokering scheme, Igor Dovman invoked his Fifth Amendment privilege against self-incrimination (A45, A753).

The Dovmans both worked out of office space located on the second floor of 2765 Coney Island Avenue, Brooklyn, New York (the "Coney Island Office") (A40, A1054, A1064). Tamilla Dovman worked as a paralegal out of the Coney Island Office for a personal injury attorney named David Feinerman, Esq. ("Feinerman") (A40, A807). An attorney named Daniel Corley, Esq. ("Corley") used the Coney Island Office, but he primarily resided and worked in New Hampshire (A40, A1048-A1050).

**B.** **New York No-Fault Laws**

New York's No-Fault Laws require automobile insurers such as GEICO to provide Personal Injury Protection Benefits ("No-Fault Benefits") to any covered individual injured by a motor vehicle accident. No-Fault Benefits include up to $50,000 per Insured for necessary expenses incurred for health care goods and services, including physician services. *See* N.Y. Insurance Law § 5102 (a).

Insureds can assign their rights to No-Fault Benefits to health care providers in exchange for the performance of services. *See* 11 N.Y.C.R.R. § 65-3.11 (a)-(b). Insureds who assign their rights have no financial responsibility to healthcare providers within the $50,000 limit, including the obligation to pay a provider for care that an insurer may decline to pay. *See* 11 N.Y.C.R.R. §65-3.11; *see also* New York State Department of Financial Services, Office of General Counsel Opinion No. 03-01-26 (January 13, 2003)(health care provider cannot pursue payment from patient where insurer has rejected the claim based upon legitimacy of services). Reimbursement rates for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "Fee Schedule"). *See* N.Y. Insurance Law § 5108.

Under New York Insurance Law § 403, forms submitted by healthcare providers to automobile insurers must be verified by the provider subject to the following warning:

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime. (A21-22).

Healthcare providers are not eligible to bill for or collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services. *See* 11 N.Y.C.R.R. § 65-3.16(a)(12). The regulation's purpose is "to assure that all providers rendering care under the No-Fault system are properly licensed in conformity with all applicable laws" and to "enhance the quality of care provided to eligible injured parties by insuring that those delivering reimbursable services are held to the appropriate professional standards." *See* 2004-40 N.Y. St. Reg. 12, 14 (Oct. 6, 2004) at 14. Insurers may look beyond a facially valid license to determine whether there was a failure by the healthcare provider to abide by state or local law. *See State Farm Mut. Auto. Ins. Co. v. Mallela*, 4 N.Y.3d 313, 320 (2005); *see also Andrew Carothers, M.D., P.C. v. Progressive Ins. Co*., 33 N.Y.3d 389 (2019).

New York law prohibits licensed healthcare services providers, including acupuncturists, from "directly or indirectly" participating in any arrangement in which money is paid in exchange for patient referrals. N.Y. Education Law § 6530(18); 8 N.Y.C.R.R. § 29.1(b)(3). Violating this prohibition can result in the "revocation" of a professional license. *See* New York Public Health Law § 230-

a(2)(4). Unlicensed persons cannot practice medicine or share in the fees for professional services. *See* New York Education Law §§ 6512, 6530(11), 6530(19). Thus, a healthcare provider is not eligible to receive No-Fault Benefits if it is fraudulently licensed, pays or receives unlawful kickbacks in exchange for patient referrals, permits unlicensed laypersons to control the practice, or allows unlicensed laypersons to share in the fees for the professional services. *See* N.Y. Education Law §§ 6509-a; 6531; N.Y. Business Corporation Law § 1507.

## C.   Defendants' Fraudulent Scheme

The following summary is taken from GEICO's Rule 56.1 Statement and Defendants' own testimony.

Between January 1, 2012, and the time of GEICO's filing of its' summary judgment motion in 2018, Mayzenberg (Mingmen's sole manager) (A39, A81-A83), caused Mingmen to submit claims to GEICO seeking payment of No-Fault Benefits totaling over $4 million (A2453-A2454). Of that total, $3,151,191.77 was pending at the time of the filing of the lawsuit and $945,163.24 had been voluntarily paid by GEICO based on false representations in Defendants' billing and supporting documentation (A2453).

Mingmen's bills and supporting documentation were submitted to GEICO through the United States mails, from Mayzenberg's office in Brooklyn, New York

11

to GEICO's claims processing center in Fredericksburg, Virginia (A39, A113, A2453).

From at least September 2015 to August 2017, while Mingmen was treating Insureds and seeking No-Fault benefits from GEICO, Mayzenberg caused Sanli and Laogong to pay a total of $389,182.00 to 16 of the Dovman Shell Entities (A41, A64, A1657-1815). At the time of the payments, Sanli was not treating patients and Laogong had previously been dissolved (A41, A100, A1555-A1557).

The $389,182.00 in payments to the Dovman Shell Entities followed the exact same pattern:

- Instead of receiving regular invoices (A42, A173, A187, A208, A211, A394, A401, A403, A407, A408, A411, A414), Mayzenberg received a phone call each month from an unidentified person requesting payment (A42, A160, A179, A180, A208).

- Mayzenberg routinely left the "pay to the order" line blank on checks issued from the Sanli account to the Dovman Shell Entities, and instead let an unknown person fill in that line (A42, A153-A154, A158).

- Mayzenberg typically left the check at his front desk so that an unknown person could collect it (A139-A140).

Notably, Mayzenberg never received copies of any of the advertising materials (A42, A142 A187, A196, A204, A392, A398, A400, A403-A404, A407, A409), and attempted to conceal the payments by paying the Dovman Shell Entities outside of the Mingmen account (A138, A165-A167, A1657-A1815, A2261-

12

A2262). Mayzenberg did not know whether the Dovman Shell Entities had physical office space, websites, or phone numbers (A42, A162, A185, A196, A204, A209-A210, A219, A228, A391, A406, A416). He also did not know anyone associated with the Dovman Shell Entities notwithstanding the pattern and magnitude of the payments (A42, A184, A196, A210, A228-A230, A391, A399, A406, A402-A403, A406, A408, A410, A413).

Mayzenberg repeatedly admitted throughout the underlying litigation that Sanli and Laogong paid the Dovman Shell Entities to "send" him patients (A160-A161, A175, A233, A403, A404, A427-A428). Mayzenberg tried to recharacterize the payments as compensation for marketing services to Mingmen. *See, e.g.*, (A132, A174-A175), but this testimony conflicted with Mayzenberg's sworn responses to GEICO's interrogatories (A1539). When GEICO asked for the names of companies Mayzenberg hired to provide "marketing or advertising services," Mayzenberg did not identify a single company, much less the 16 Dovman Shell Entities to which he funneled more than $389,000.00 (A1539).

GEICO's forensic accounting expert confirmed that none of the Dovman Shell Entities ever made a payment to any vendor that produced "flyers" or to any advertising agency or newspaper to purchase advertising space. GEICO's forensic accounting expert also confirmed that none of the Dovman Shell entities (i) owned or leased office space; (ii) paid any identifiable employees, legitimate vendors, or

13

local, state, and/or federal agencies or tax collectors; or (iii) maintained a website or social media presence (A46, A2257, A2261-A2262)

Mayzenberg admitted that he did not know the nature of the services allegedly provided by the Dovman Shell Entities, except he claimed (i) they created "flyers" of which he did not have copies, and (ii) they placed advertisements in newspapers, which he could not name (A42, A142 A187, A196, A204, A392, A398, A400, A403, A404, A407, A409). Mayzenberg's only concern in paying the Dovman Shell Entities was whether these companies referred patients to Mingmen (A48, A175). Mayzenberg stated that his only measure of whether the Dovman Shell Entities were performing any services was whether Mingmen continued to see a steady stream of patients (A49, A177-A178, A187), yet he made no efforts to track which (if any) marketing services resulted in patients (A49, A177-A178, A466-A467). The unlawful nature of the entire structure was summarized by Mayzenberg's admission that he would pay a garbage removal company if that company could find patients in the garbage and send them to Mingmen (A48, A175).

Igor Dovman invoked his Fifth Amendment Privilege when asked (i) whether he, or any company with which he was associated, had ever received money in exchange for causing a patient to be referred to Mayzenberg or Mingmen, and (ii) whether he had incorporated a series of companies to conceal a no-fault kickback and/or patient brokering scheme (A45, A47-48, A758). Dovman also invoked the

14

Fifth Amendment in response to nearly every substantive question posed at his deposition.  GEICO lists many of the questions that Dovman refused to answer, citing the Fifth Amendment (A56-A60).

Efforts to conceal and/or launder funds associated with the patient kickback/brokering scheme were evident.  Funds Mayzenberg paid to the Dovman Entities through Sanli and Laogong were either withdrawn as cash or funneled to another shell company controlled by Igor Dovman (A46, A2248-A2249).  To illustrate, the Dovman Shell Entities to which the Defendants made payments transferred $822,662.45 to another Dovman Shell Entity, SIT Jewelry, Inc. (A46-A47, A1899-A1960).  SIT Jewelry, Inc. maintained a corporate bank account with Capital One Bank, which listed Igor Dovman as its president and sole corporate signatory (A47, A1558-A1650).

Mayzenberg also caused Sanli to issue 12 checks to Corley, totaling $77,185.50 from September 2015 to June 2017 (A2027- A2049).  Notably:

- All these checks were deposited into an attorney operating account in Corley's name at Santander Bank (the "Corley Santander Bank account") (A49, A2026-A2050, A2164-A2180).

- When asked whether he had an attorney operating account at Santander Bank, Corley also invoked the Fifth Amendment (A49, A1267-A1268).

- Between December 2014 and October 2017, the Corley Santander Bank account issued checks totaling over $1,400,000 to companies that Igor Dovman held himself out as president and signatory (A49, A2054-A2163, A2251-A2252).

15

- Igor Dovman's handwriting appeared on checks issued from the Corley Santander Bank account (A49, A2773-A2775).

Mayzenberg also admitted to paying other entities for patient referrals. Mayzenberg admitted paying Desiree Reid $17,287 in exchange for patient referrals (A474-A475, A2164-2180). He similarly admitted to paying $72,000 to Nina Bruk Enterprise (A420-A424, A2181-2222) and $6,900 to Dona Catalina Marketing, LLC in exchange for patient referrals (A460-A463, A2223). In total, Mayzenberg paid $562,554.50 in kickbacks. To conceal the payments, all kickbacks were paid through either Sanli or Laogong, rather than Mingmen (A41, A64, A1657-1815, A2164-A2224).

## D.    **GEICO's Amended Complaint**

GEICO commenced this action against Defendants after uncovering the no-fault fraud scheme. Discovery revealed the existence of a large-scale fraud conspiracy involving Defendants and the Dovmans, and GEICO filed an Amended Complaint naming the Dovmans and Laogong.[3]

---

[3] Defendants' scheme was aimed at the entire New York automobile industry. Among others, the kickback and patient brokering scheme was directed against Allstate insureds well. *See Allstate et al. v. City Wide Health Facility, Inc. et al.*, 1:21-cv-06509-MKB-RML, Docket No. 1 at ¶164. Allstate discontinued the action after reaching a settlement to resolve its claims of a fraudulent kickback scheme against Mayzenberg and Mingmen. *See id.* at Docket No. 37.

GEICO alleged that Mayzenberg paid the Dovmans kickbacks in exchange for patient referrals, used independent contractors to perform medically unnecessary treatment according to pre-determined protocols, and exaggerated/misrepresented the necessity of the services when seeking reimbursement from GEICO under the portions of its automobile policies mandated by New York's No-Fault law. GEICO contended that Defendants engaged in a widescale fraud scheme and were ineligible for No-Fault benefits.[4]

GEICO sought to recover payments made to Defendants, and to preclude Defendants from recovering on their pending claims, asserting eight causes of action, including (i) a declaratory judgment that Defendants were ineligible to collect on any pending bills, (ii) claims for RICO and RICO conspiracy under 18 U.S.C. § 1962(c) and (d); and (iii) common law fraud and unjust enrichment.

---

[4] GEICO moved for a preliminary injunction during the litigation staying pending and future collection proceedings. *See Govt. Employees Ins. Co. v Mayzenberg*, 17-CV-2802, 2018 WL 6031156, at *1 (E.D.N.Y. Nov. 16, 2018). The District Court granted the motion, reasoning that GEICO showed a likelihood of success on its declaratory judgment claim because Mayzenberg unlawfully paid kickbacks in exchange for patient referrals in violation of New York licensing laws, which rendered his professional corporation, Mingmen, ineligible for No-Fault benefits. *Id.* at *7, *11. No appeal from the decision and order was taken.

E.    **Competing Summary Judgment Motions**

1.    **GEICO's Motion for Summary Judgment**

Following discovery, GEICO moved for summary judgment on claims one through six, but not on claims seven (common law fraud) and eight (unjust enrichment) (A62).  GEICO's motion relied on the evidence of kickbacks paid by Defendants (A62).  GEICO did not move on any other ground.[5]  *See* Case 1:17-cv-02802, ECF Nos. 120 at *9-29 & 130 at *5-10.

GEICO's motion was supported by the following: (1) Rule 56.1 Statement (A37-60); (2) Declaration of Michael Sirignano, Esq. (A61-A67), and 31 evidentiary exhibits (A68-A2232); (3) Declaration of Mark Warshavsky (A2234) and his expert report and exhibits (A2235-A2451); (4) Declaration of Robert Weir and exhibits (A2452-A2762); (5) Declaration of Dennis Ryan (A2763) and his expert report and exhibits (A2764-A2826).  The key evidence submitted in support of GEICO's summary judgment motion is discussed above.

GEICO argued that the undisputed evidence, including Mayzenberg's own sworn testimony that he paid a series of individuals and entities to send patients to

---

[5] Claims seven and eight were later dismissed without prejudice under Rule 41, and final judgment entered (A3263-A3264).  GEICO disclaims any intent to revive claims seven, eight, and any other claims not resolved by the District Court.  This statement is "sufficient to cure any defect in appellate jurisdiction and to permit [this Court] to review the district court's order…"  *See Alix v McKinsey & Co.*, 23 F.4th 196, 203 (2d Cir.) *cert. denied*, 143 S. Ct. 302 (2022).

his acupuncture practice, proved that Defendants defrauded GEICO by having Mingmen submit bills for acupuncture services that were the product of an unlawful kickback scheme. *See* Case 1:17-cv-02802, ECF Nos. 120 at *1, *3, *27-*30. GEICO further explained that paying unlawful kickbacks in exchange for patient referrals violated N.Y. Educ. Law § 6530(18) and 8 N.Y.C.R.R. § 29, rendering Defendants ineligible for No-Fault Benefits. *See id.* at *7. GEICO argued that it had no obligation to pay the $3,151,191.77 in pending claims and was entitled to recover $945,163.24, representing the No-Fault benefits previously paid to Defendants.

GEICO also argued that it had established the right to summary judgment on its cause of action for civil RICO against Mayzenberg, 18 U.S.C. §1962(c), as well as its claim against all Defendants and the Dovmans for civil RICO conspiracy under 18 U.S.C. § 1962(d). Additionally, GEICO argued that the damages of $945,163.24 associated with the voluntarily paid claims should be trebled to $2,835,489.72.

Additionally, GEICO contended that the evidence established all the elements for common law fraud, unjust enrichment, and aiding and abetting fraud because Mayzenberg and Mingmen knowingly misrepresented its eligibility for No-Fault benefits (as demonstrated by his efforts to conceal the kickbacks), the Dovmans facilitated those misrepresentations, GEICO relied on those misrepresentations, and paid No-Fault claims in reliance on those misrepresentations. *Id.* at *38-42.

### 2.  **Defendants' Opposition and Motion for Summary Judgment**

Defendants opposed GEICO's summary judgment motion and moved for summary judgment dismissing the claims against them.  In doing so, Mayzenberg submitted his own four-page affidavit consisting of twenty-four paragraphs (A3135-A3139), the majority of which pertain to Mayzenberg's own motion for summary judgment.

The six paragraphs that oppose GEICO's motion state that he paid Nina Brouk Advertisement and Dona Catalina Marketing LLC for marketing and advertising services (A3138).  Mayzenberg did not dispute that the services offered by these companies violate New York law prohibiting payment for patient referrals.

In apparent recognition of the overwhelming evidence that the Dovman Shell Entities did not provide any services, Mayzenberg stated: "It was *my understanding* that the payments which ultimately went to the companies identified by Geico as the Dovman shell companies were for similar [marketing and advertising] services." (A3138) (emphasis added).  Despite his prior sworn testimony, Mayzenberg denied, in conclusory fashion, paying "any money to anyone as a kickback in exchange for the referral of any patient" (A3139).  Notably, he did not offer any explanation for why he previously admitted that he paid the Dovman Shell Entities to "send" him patients, why he paid a garbage removal company for marketing services, why he

paid the Dovman Shell Entities through the inactive Sanli, or why he did not list any of the Dovman Shell Entities in their response to GEICO's interrogatories.

Mayzenberg denied paying kickbacks to Daniel Corley in the same superficial way (A3139). Despite this denial, Mayzenberg did not offer any reason why he paid Corley, a personal injury attorney licensed in New York and residing in New Hampshire, $77,185.50 over two years (A2027- A2049). And neither Mayzenberg nor any other Defendants disputed GEICO's contentions that the bank account in Corley's name – into which all the payments from Defendants were deposited – was controlled by Dovman and operated as another Dovman Shell Entity (A49-A51, A2051).

Mayzenberg also attempted to walk back his testimony about paying Desiree Reid for patient referrals, claiming that he testified to paying "money for marketing never for any direct referral" (A3139). Mayzenberg did not however, reconcile this statement with his brazen admissions during his sworn deposition. For example, in response to being asked why he had Sanli pay Desiree Reid for "referring patients," Mayzenberg answered: "Referring patients, but why not?" (A475).

Similarly, Defendants did not dispute that Nina Brouk and Dona Catalina operated as "medical referral services" that referred patients to Mingmen in exchange for payments from the Defendants (A51-A53).

Finally, Mayzenberg's affidavit states "I did not know Igor Dovman or Tamilla Dovman at the time of any of the checks were written by my companies…The only communication between me and Igor Dovman came during this case around the time of Mr. Dovman's deposition in *January* and March *of 2018*" (A3139) (emphasis added). Mayzenberg did not reconcile this statement with his testimony *in March 2018* stating that he had never even "become aware" of anyone named Igor Dovman or the fact that telephone records show he communicated with Igor Dovman as early as November 2017 (A235, A249, A2017-A2023).

Defendants argued that GEICO failed to establish a scheme for illegal kickbacks because GEICO could not connect "a single GEICO patient" with the "moneys paid by Mayzenberg" to the Dovman Shell Entities. *See* Case 1:17-cv-02802, ECF Nos. 128 at *9. Defendants argued, "GEICO can only show a series of checks written by Sanli and Laogong to various corporations." *Id.*

## F. <u>District Court Order</u>

The District Court granted most of GEICO's motion and denied Defendants' motion in its entirety. The District Court found that the only rational conclusion from the undisputed evidence and Mayzenberg's admissions was that Mayzenberg paid kickbacks for patient referrals, which rendered Defendants ineligible for No-

Fault benefits because kickbacks are willful, material, grave failures to abide by licensing statutes. *See* Case 1:17-cv-02802, ECF No. 148 at *9-10.

In reaching this conclusion, the District Court relied on several factors. First, Defendants failed to sustain a genuine dispute of material fact as to whether the Dovman Shell Entities provided lawful marketing and advertising services instead of patient referrals. Mayzenberg's bare assertions were insufficient absent any evidence of marketing and advertising services. *Id.* at *10.

Also, Mayzenberg did not list the Dovman Shell Entities in response to GEICO's interrogatory seeking the names of vendors who provided marketing and advertising services. He contended that the Dovman Shell Entities provided such services only after GEICO identified Igor Dovman as a witness. *Id.* Similarly deceptive was Mayzenberg's statement that his only communication with Igor Dovman was in January and March of 2018, yet telephone records show that they had communicated as early as November 2017. *Id.*; *see also* (A2017-A2023). The District Court also noted "improprieties in the Dovman Companies' incorporation and that the convoluted routes by which Mingmen paid the Dovman Companies cast a pall of illegitimacy over the Dovman Companies and their dealings with the Defendants. *Id.* at *10-*11.

The District Court also relied on Mayzenberg's own testimony about paying for patient referrals. The District Court identified key admissions about his payment for patient referrals, including this example:

> Q. Why would you pay a company called Garbage Removal for advertising and marketing services?
>
> A. I don't care what the name of the company is. . . If garbage removal company can find people, people in garbage there, and sends them to the clinic, I don't care how garbage company is called. *Id.* at *11

The District Court also relied on Mayzenberg's brazen admission that he was still searching for patient referrals. *Id.* at *11, *12.

The District Court also relied heavily on the fact that Defendants' witnesses repeatedly failed to rebut GEICO's evidence. *Id.* at *13. Tamilla Dovman could not explain what Defendants were provided with in exchange for their payments to the Dovman companies, and Igor Dovman invoked his Fifth Amendment privilege against self-incrimination in response to being asked if he referred patients to Defendants in exchange for payments from Sanli and Laogong. *Id.*

Having found that Defendants engaged in unlawful kickbacks in exchange for patient referrals, the District Court granted GEICO summary judgment on all its claims, except for its unjust enrichment claim, which the court found duplicative of GEICO's fraud claims. *See id.* at *15-*26.

**G.**    **Final Judgment**

GEICO discontinued its remaining causes of action for common law fraud against Sanli and Mayzenberg and unjust enrichment against Sanli and Mayzenberg (A3263-A3264).  As a result, the District Court issued a final judgment, which (i) declared Mingmen ineligible for reimbursement from GEICO on all pending claims, (ii) awarded GEICO $2,835,489.72 against Defendants under 18 U.S.C. § 1962(c), (d), and (iii) awarded GEICO $945,163.24 against Defendants on its claims for common law fraud and aiding and abetting fraud.

This appeal by Defendants ensued.  The Dovmans initially appealed but withdrew their appeals with prejudice after reaching a settlement with GEICO.

25

## **SUMMARY OF ARGUMENT**

The District Court properly granted GEICO summary judgment declaring that Mingmen was ineligible for No-Fault Benefits because it paid kickbacks for patient referrals and awarding GEICO judgment on its RICO and fraud-based claims. The only rational conclusion from the record is that Mayzenberg routinely paid kickbacks for patient referrals.

Paying for patient referrals is a violation of a licensing requirement governing the practice of acupuncture in New York, which prohibits payment of kickbacks (directly or indirectly) for patient referrals and makes clear that violation of this law can result in revocation of the professional's license. Compliance with this requirement by the licensed professional is necessary to perform acupuncture services in New York and engaging in such unlawful conduct renders the provider ineligible for payment under New York's no-fault system. That conclusion has been routinely and uniformly reached by the District Courts in this Circuit, was adopted by the District Court here, and should be affirmed.

Defendants' contention that paying kickbacks for patient referrals should have no effect on a healthcare provider's eligibility to collect No-Fault benefits defies the text of the governing regulation, undermines its purpose, and conflicts with New York Court of Appeals' precedent. The governing regulation provides that a medical services provider (of which an acupuncturist in one) is ineligible for No-Fault

Benefits if the provider fails to meet any "licensing requirement necessary to perform such services…." 11 N.Y.C.R.R. § 65-3.16(a)(12). The violation of New York's anti-kickback laws can result in the revocation of a professional's license, making compliance with these laws *necessary* to perform acupuncture services in New York.

Further, the fundamental purpose of the regulation is to promote licensed professionals' compliance with applicable laws and professional standards and to protect the quality of care that patients receive. New York's prohibition against kickbacks prevents non-professionals from interfering with a licensed healthcare provider's professional judgment in a way that compromises professional standards and patient safety and promotes the exploitation of patients for financial gain. This is especially relevant under New York's no-fault system where (i) accident victims generally assign their right to benefits to providers and have no responsibility to pay for healthcare up to the limits of the coverage, and (ii) automobile insurers have no right to manage patient care. The checks and balances normally created by these types of controls do not exist. Kickbacks for patient referrals create perverse incentives for professionals to exploit the patients they paid for by providing unnecessary services or treating them according to predetermined protocols to increase reimbursement payable by automobile insurers. The facts of this case and Mayzenberg's admission that he would continue to treat patients regardless of need

exemplify just how kickbacks drive that behavior and compromise professional judgment.

The kickback scheme here does not differ in any meaningful way from the licensing violations the New York Court of Appeals found in *Mallela* and *Carothers* to render the licensed professional ineligible for payment, where nonprofessionals controlled professional corporations by charging for excessive equipment and management fees. The kickback scheme here varies the classic *Mallela-Carothers* arrangement by altering the means, but not the result. Instead of overcharging the Defendants for equipment or management fees, the Dovmans charged for patients, which allowed the same level of influence and control over Defendants. Regardless of the method, the result is the same. The nonprofessionals retain the power to manipulate professional entities, eroding professional standards, compromising patient care, and undermining New York law. The cause and effect illustrated here are actually very simple: (i) no payments, no patients, and (ii) without patients, no ability to bill and collect from New York automobile insurers. Considering New York law and the corresponding public policy, the District Court properly found that Defendants were ineligible to collect No-Fault benefits, and correctly entered a declaratory judgment in GEICO's favor to that effect.

The District Court also properly granted GEICO summary judgment on its RICO claim, 18 U.S.C. § 1962(c), and entered a judgment against Mayzenberg for

$2,835,489.72. GEICO established all elements of its claim and Defendants' contention on appeal that GEICO needed to trace each kickback to a specific patient is wrong. New York law makes clear that a healthcare provider that pays or receives kickbacks in exchange for patient referrals operates in violation of New York's licensing requirements, and therefore lacks any entitlement to collect No-Fault benefits in connection with any of its claims. Thus, GEICO was entitled to recover treble damages and was properly awarded judgment of $2,835,489.72.

Finally, the District Court properly granted GEICO summary judgment on its common law fraud claim and entered a judgment against Mayzenberg for $945,163.24. GEICO established that the kickback scheme here involved a material misrepresentation or omission of fact by Mingmen regarding its eligibility for benefits, made with knowledge of its falsity, reasonable reliance on the part of GEICO, and causally related damages in the form of benefits paid to an ineligible professional entity.

# ARGUMENT

## POINT I

**THE DISTRICT COURT PROPERLY GRANTED GEICO SUMMARY JUDGMENT DECLARING THAT MINGMEN WAS INELIGIBLE FOR NO-FAULT BENEFITS BECAUSE IT PAID KICKBACKS FOR PATIENT REFERRALS**

### A.  General Legal Principles

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The Court must "consider the record in the light most favorable to the nonmovant . . . [and] resolve all ambiguities and draw all factual inferences in favor of the non-movant[, but only] 'if there is a "genuine" dispute as to those facts.'" *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 13 F.4th 247, 259 (2d Cir. 2021) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). To sustain a factual dispute, a party "must affirmatively 'set forth specific facts showing that there is a genuine issue for trial.'" *Perfect Dental, PLLC v. Allstate Ins. Co.*, 538 F. Supp. 2d 543, 546 (E.D.N.Y. 2007) (quoting Fed. R. Civ. P. 56(e)).  A non-movant must show more than "some metaphysical doubt as to the material facts" to establish that a dispute is genuine.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

Affidavits or declarations submitted in opposition to a summary judgment motion must "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). As a result, an affidavit not based on personal knowledge can be disregarded. *See Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988). An affidavit with statements based on "the best of [the affiant's] knowledge" (*United States v. Priv. Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 44 F.3d 1082, 1084 (2d Cir. 1994)) or the affiant's "understanding" (*Star Ins. Co. v. Hazardous Elimination Corp.*, 2007 WL 316569, at *13 (E.D.N.Y. Jan. 30, 2007)) are insufficient to sustain a genuine dispute of material fact. When "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587.

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). As a result, if "no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

**B.** <u>**Eligibility For No-Fault Benefits**</u>

Healthcare providers are not eligible to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services. *See* 11 N.Y.C.R.R. § 65-3.16(a)(12). Insurers may look beyond a facially valid license to determine whether there was a failure to abide by state or local law. *See Mallela*, 4 N.Y.3d at 320; *see also Andrew Carothers, M.D., P.C.*, 33 N.Y.3d 389.

The regulations do not contain a comprehensive list of the licensing violations that render a healthcare provider ineligible for no-fault benefits, but New York Court of Appeals has explained that only "willful and material" licensing violations will render a provider ineligible under 11 N.Y.C.R.R. § 65-3.16(a)(12). *See Mallela,* 4 N.Y.3d at 321-22. The Court of Appeals later clarified in *Carothers* that material violations must "'rise to the level of' a grave violation *such as* fraud" for a provider to be ineligible for no-fault benefits, but an insurer need not establish "the traditional elements of common-law fraud" or show that the licensing violation approximates fraud. *Id.* 33 N.Y.3d at 406 (emphasis in original). As a result, "[t]echnical violations" such as "a failure to hold an annual meeting, pay corporate filing fees or submit otherwise acceptable paperwork on time" do not qualify as material violations. *See Mallela*, 4 N.Y.3d at 322. Applying these principles, the New York Court of Appeals held in *Mallela* and *Carothers* that a willful violation of New York

32

Business Corporation Law § 1507, which prohibits nonphysicians from owning or operating a medical service corporation, renders a medical services provider ineligible for No-Fault benefits.  *See Mallela*, 4 N.Y.3d at 319, n 1; *Carothers*, 33 N.Y.3d at 397.

Section 1507 of the Business Corporation Law embodies New York's long-standing public policy that "[o]nly licensed physicians may practice medicine in New York."  *Carothers*, 33 N.Y.3d at 393.  The justification for this policy is that ownership by non-professionals, who are not bound by ethical rules, can impair professional judgment and, as a result, compromise patient safety.  *See Carothers*, 33 N.Y.3d at 393.

For similar reasons, New York law also prohibits licensed healthcare providers, including acupuncturists, from paying or accepting kickbacks in exchange for patient referrals.  *See* New York Education Law §§ 6509-a; 6530(18); and 6531; *see* Committee on Fraud in Health Care of the New York Board for Professional Medical Conduct in its Report on Fee Splitting, Mar. 5, 2001 ("Report on Fee Splitting") at pp. 6-8.  New York law also expressly prohibits unlicensed persons from sharing in the fees for professional services.  *See* New York Education Law §§ 6512, 6530(11), 6530(19).

**C.**     **Mingmen Is Ineligible For No-Fault Benefits**

     **1.**     **GEICO Established That Mayzenberg**
           **Paid Kickbacks For Patient Referrals**

Here, there was no genuine dispute that Mayzenberg paid kickbacks in exchange for patient referrals. Mayzenberg brazenly admitted that paying for patient referrals was actually a critical element of his business model. For example, in response to being asked why Sanli paid Desiree Reid for "referring patients," Mayzenberg answered: "Referring patients, but why not?" (A475). Mayzenberg also admitted that he was actively looking for others who would refer patients in exchange for kickbacks at the time of his deposition: "Q. Have you paid other persons besides Desiree Reid for referring patients to Mingmen's practices? A. Could be, but I don't remember. Actually, I'm looking for some[.]" (A476).

Mayzenberg's words were backed up by his actions. He caused Sanli to pay Desiree Reid $17,287.00 (A2164-A2180) and admitted he made these payments in exchange for a combination of cosmetics and patient referrals (A474-A475). Mayzenberg admittedly paid $72,000.00 to Nina Bruk Enterprise (A2181-A2222) and $6,900 to Dona Catalina Marketing, LLC (A2223-A2224) in exchange for patient referrals (A421, A423, A460, A1466-A1468, A1475).

Mayzenberg also admitted he paid the Dovman Shell Entities so that they would "send" him patients (A160-A161, A175, A233, A403, A404, A427-A428).

Mayzenberg admittedly paid $389,182.00 to the Dovman Shell Entities - sixteen different entities with no discernible business operations.

Mayzenberg concealed those payments from insurers and any other third-party by withdrawing funds from Mingmen, depositing them with Sanli and Laogong (two professional corporations that had ceased operating years prior), and paying the Dovman Shell Entities with Sanli and Laogong funds (A41, A100, A1555-A1557, A2238). In fact, Mayzenberg continued to conceal these payments during this litigation when he failed to identify a single Dovman Shell Entity in his response to interrogatories seeking the identity of vendors hired on behalf of his professional corporations (A1539). When confronted with these facts at his deposition, Mayzenberg finally admitted that he paid all the Dovman Shell Entities in the same highly unorthodox way. Instead of receiving regular invoices (A42, A173, A187, A208, A211, A394, A401, A403, A407, A408, A411, A414), Mayzenberg received a phone call each month from an unidentified person requesting payment to the Dovman Shell Entities (A42, A160, A179, A180, A208). Mayzenberg routinely left the "pay to the order" line blank on checks issued from the Sanli account to the Dovman Shell Entities, and instead let an unknown person fill in that line (A42, A153-A154, A158).

After concealing these payments and describing a highly usual method of payment, Mayzenberg failed to offer any plausible explanation for the payments.

35

*Matsushita*, 475 U.S. at 596.  He testified that he paid the Dovman Shell Entities for marketing and advertising services, but no rational juror could accept this implausible, *post hoc* characterization (A132, A174-A175).  Mayzenberg's after the fact characterization in opposing summary judgment conflicts with his interrogatory responses, which did not list a single person or entity - much less the Dovmans or the Dovman Shell Entities - in response to questions about the names of companies Mayzenberg hired to provide "marketing or advertising services" (A1539). Mayzenberg cannot raise a factual dispute on summary judgment by relying on "crafted" testimony inconsistent with prior sworn statements.  *See Jeffreys v. City of New York*, 426 F.3d 549, 55 (2d Cir. 2005).

In that context, it is significant that Mayzenberg could not produce any evidence to corroborate his characterization of the payments to the Dovman Shell Entities as legitimate marketing or advertising expenses. Mayzenberg never received copies of any of the advertising materials (A42, A173, A187, A208, A211, A394, A401, A403, A407, A408, A411, A414), and he did not know whether the Dovman Shell Entities had physical office space, websites, or phone numbers (A42, A162, A185, A196, A204, A209-A210, A219, A228, A391, A406, A416).  He did not know anyone associated with the Dovman Shell Entities (A42, A184, A196, A210, A228-A230, A391, A399, A406, A402-A403, A406, A408, A410, A413). Mayzenberg further admitted that he did not know the nature of the services provided

36

by the Dovman Shell Entities, except that he claimed they created "flyers" of which he did not have copies and they placed advertisements in newspapers, which he could not name (A42, A142 A187, A196, A204, A392, A398, A400, A403, A404, A407, A409).

Instead, Mayzenberg testified that his only measure of whether the Dovman Shell Entities were performing any services was whether Mingmen continued to see a steady stream of patients (A49, A177-A178, A187), yet he made no efforts to track which marketing services resulted in patients (A466-A467).

Igor Dovman, for his part, refused to answer any substantive questions about the Dovman Shell Entities or the payments they received from Mayzenberg (A56-A60).  These invocations of the Fifth Amendment right against self-incrimination warrant a negative inference against the Defendants.  *See LiButti v. United States*, 107 F.3d 110, 120-21 (2d Cir. 1997).

Thus, neither Mayzenberg nor Igor Dovman offered a plausible characterization for systemic payments from dormant professional corporations to sixteen different companies, all of which were controlled by the Dovmans but lacked any apparent business operations – besides that these payments were made by Defendants in exchange for the Dovmans sending patients to Mingmen.  Considering Mayzenberg's admitted practice of paying kickbacks for patient referrals, a rational

jury could form only one conclusion: the payments to the Dovman Shell Entities were unlawful kickbacks.

Likewise, GEICO established that Mayzenberg paid Daniel Corley, Esq. $77,185.50, and the only plausible conclusion was that the Corley bank account functioned as another Dovman Shell Entity and the payments were similarly kickbacks to the Dovmans for patient referrals. All checks to Corley were deposited into Corley's Santander Bank account, which transferred more than $1,400,000.00 using checks written by Igor Dovman to companies for which Igor Dovman held himself out as president and signatory (A49, A2026-A2050, A2164-A2180). When asked whether he had an attorney operating account at Santander Bank, Corley invoked his Fifth Amendment privilege, warranting a negative inference against the Defendants (A49, A1267-A1268, A2773-A2775); *See U.S. S.E.C. v. Suman*, 684 F. Supp. 2d 378, 387 (S.D.N.Y. 2010), *aff'd*, 421 F. App'x 86 (2d Cir. 2011) (citing *LiButti*, 107 F.3d 120-21).

Finally, Defendants conceded that their payments to Dona Catalina and Nina Brouk were in exchange for patient referrals. Those payments were made so Mingmen appeared on lists prepared by Dona Catalina and Nina Brouk, who referred patients *only* to healthcare providers who appeared on their lists.

Thus, the District Court correctly found that Mayzenberg routinely paid kickbacks for patient referrals.

## 2. Defendants Are Ineligible To Collect No-Fault Benefits Because The Payment Of Kickbacks Is A Licensing Violation

The District Court correctly held that Defendants are ineligible to collect No-Fault benefits under 11 N.Y.C.R.R. § 65-3.16(a)(12) because they committed willful and material licensing violations. New York law prohibits acupuncturists from directly or indirectly paying kickbacks for patient referrals and makes clear that violation of this rule can result in the revocation of a professional's license. *See* 8 N.Y.C.R.R. § 29.1(b)(3);

The District Courts in this Circuit have routinely and uniformly held that licensing violations from unlawful kickback schemes render a medical provider ineligible to collect No-Fault Benefits. *See, e.g., State Farm Mut. Auto. Ins. Co. v. Metro Pain Specialists P.C.*, No. 21-CV-5523 (MKB), 2022 WL 1606523, at *16 (E.D.N.Y. May 20, 2022) (Preliminary injunction); *Gov't Emps. Ins. Co. v. Landow*, No. 21-CV-1440-NGG-RER, 2022 WL 939717, at *8 (E.D.N.Y. Mar. 29, 2022); *Gov't Emps. Ins. Co. v. Elmwood Park Med. Grp., P.C.*, No. 21-CV-617 (FB) (RER), 2022 WL 772737, at *7 (E.D.N.Y. Feb. 23, 2022) (default judgment); *Gov't Emps. Ins. Co. v. Relief Med., P.C.*, 554 F. Supp. 3d 482, 500 (E.D.N.Y. 2021) (preliminary judgment); *Gov't Emps. Ins. Co. v. Zilberman*, No. 1:20-CV-00209-FB-RML, 2021 WL 1146086, at *2 (E.D.N.Y. Mar. 25, 2021) (preliminary injunction); *Gov't Emps. Ins. Co. v. Zaitsev*, No. 1:20-CV-03495-FB-SJB, 2021 WL

39

3173171, at *3 (E.D.N.Y. July 27, 2021) (preliminary injunction); *Gov't Emps. Ins. Co. v. Cean*, No. 19-CV-2363-PKC-SMG, 2019 WL 6253804, at *5 (E.D.N.Y. Nov. 22, 2019) (preliminary injunction); *Gov't Emps. Ins. Co. v. Erlikh*, No. 16-CV-7120-DLI-SJB, 2019 WL 1487576, at *8 (E.D.N.Y. Feb. 28, 2019) (default judgment); *Gov't Employees Ins. Co. v. Jacques*, No. 14 Civ. 5299(KAM)(VMS), 2017 WL 9487191, at *7–8 (E.D.N.Y. Feb. 13, 2017); *Gov't Employees Ins. Co. v. Badia*, No. 13-CV-1720 (CBA)(MVS), 2015 WL 1258218, at *15 (E.D.N.Y. Mar. 18, 2015); *GEICO v. Alrof, Inc.*, No. 11 Civ. 4028(SLR)(RER), 2013 WL 9600668, at *4 (E.D.N.Y. July 19, 2013).

Because Defendants routinely and willfully violated New York law prohibiting payment for patient referrals, the District Court properly held Defendants were ineligible to collect No-Fault Benefits and properly entered a declaratory judgment accordingly.

**D.  <u>Defendants' Arguments On Appeal Lack Merit</u>**

**1.  The Kickbacks Render Defendants<br>Ineligible For No-Fault Benefits**

Defendants argue that a healthcare provider's payment of kickbacks has no effect on its eligibility to recover No-Fault benefits under 11 N.Y.C.R.R. § 65-3.16(a)(12). *See* App. Br. at 24. This contention has no basis in either the text of the regulation, its purpose, New York case law, or common sense.

40

The text of 11 N.Y.C.R.R. § 65-3.16(a)(12) provides that a health care services provider is ineligible to collect No-Fault Benefits "if the provider fails to meet any applicable New York State or local licensing requirement *necessary to perform such service* in New York…." *Id.* (emphasis added). The violation of New York's anti-kickback laws can result in the "revocation" of a professional's license, making compliance with these laws *necessary* to perform acupuncture services in New York. *See* New York Education Law § 6530(18); 8 N.Y.C.R.R. § 29.1(b)(3); N.Y. Pub. Health L. § 230-a(4). The fact that Mayzenberg's license has not been revoked as of the date of this brief is irrelevant because courts can look in the civil context beyond a facially valid license "to identify willful and material failure to abide by state and local law." *See Mallela*, 4 N.Y.3d at 321. Clearly, if, when Mayzenberg applied for his acupuncture license (or applied to have Mingmen become licensed by the Department of Education) he disclosed that he would employ a regular practice of paying kickbacks in exchange for patient referrals, the relevant licensing authorities would have declined to issue those licenses.[6]

Defendants do not offer any principled reason for their narrow interpretation of 11 N.Y.C.R.R. § 65-3.16(a)(12), and none exists. The stated purpose of section

---

[6] This reasoning tracks the justification for the licensing violations addressed by the Court of Appeals in *Mallela* and *Carothers*. Had the physicians in *Mallela* or *Carothers* disclosed to the relevant licensing boards that their medical practices would be owned and controlled by non-physicians, those licenses would also not have been issued.

65-3.16(a)(12) is "to assure that all providers rendering care under the No-Fault system are properly licensed in conformity with *all applicable laws*" and to "enhance the quality of care provided to eligible injured parties by insuring that those delivering reimbursable services are *held to the appropriate professional standards.*" *See* 2004-40 N.Y. St. Reg. 12, 14 (Oct. 6, 2004) at 14 (emphasis added). The text and purpose of the regulation demand that a professional who violates the "applicable laws" setting professional standards, which can result in the revocation of a license, is not "properly licensed in conformity with all applicable laws" *Id.*

Defendants' distinction also conflicts with New York Court of Appeals case law. In *Mallela* and *Carothers*, unlicensed individuals controlled professional corporations by hiring "management companies (owned by the nonphysicians), which billed the medical corporations inflated rates for routine services" (*Mallela*, 4 N.Y.3d at 319–20) and charging the professional corporation "exorbitant" rental fees for MRI equipment (*Carothers*, 33 N.Y.3d at 394).

The kickback scheme here varies the classic *Mallela-Carothers* arrangement by altering the means, but not the end. Instead of charging Defendants for equipment or management fees, the Dovmans charged for patients. Given that a professional corporation cannot exist without patients, the Dovmans exerted enormous power over Defendants. But whether a nonprofessional uses management fees, MRI rentals, or patient referrals, the result is the same. The nonprofessional has the power

42

to manipulate the professional corporation, eroding professional standards, compromising patient care, and undermining New York law.

What's more, Defendants' proposed distinction makes little sense considering New York's public policy. New York law's prohibition on unlicensed persons from owning/controlling professional corporations and from paying kickbacks for patient referrals both emanate from the public policy concern that such arrangements impair professional judgment and, as a result, compromise patient safety.

As the Court of Appeals explained in *Carothers*, unlicensed individuals cannot practice medicine because they "are not bound by the ethical rules that govern the quality of care delivered by a physician to a patient." *Carothers*, 33 N.Y.3d at 393; *see also* Report on Fee Splitting, Mar. 5, 2001 at pp. 6-8 (emphasizing that individuals who are licensed to practice medicine must exercise their own independent and individual judgment in treating patients). Thus, the purpose of the prohibition on unlicensed ownership of medical practices is to prevent non-professionals from interfering with the ethics and professional judgment of the practitioner because such interference compromises patient safety.

The same public policy undergirds New York's prohibition on paying for patient referrals. As explained by the Committee on Fraud in Health Care of the New York Board for Professional Medical Conduct, "Paying or receiving a fee for referral of a patient is the most obvious way in which fee splitting compromises a

43

physician's *professional medical judgment*." *See* Report on Fee Splitting, Mar. 5, 2001 at p.7 (emphasis added). Precluding such arrangements "prevent[s] the financial motivations of the person or entity with whom the fee is to be split from *interfering with the physician's professional medical judgment*" and "reduce[s] opportunities for fraud by prohibiting arrangements in which someone other than the physician has a financial incentive for increasing the physician's revenues." *See id.* at p.6 (emphasis added). Section 65-3.16(a)(12) was designed to address both harms "by insuring that those delivering reimbursable service are held to appropriate professional standards." 2004-40 N.Y. St. Reg. 12, 14 (Oct. 6, 2004). Defendants cannot reconcile their proposed distinction with these common policy objectives.

This public policy is magnified in the No-Fault context. Paying for patient referrals at the scale Mayzenberg did here places especially intense pressure on professionals in the No-Fault industry. No-Fault reimbursement rates are established by the Fee Schedule, not by negotiation with insurance carriers. *See* Insurance Law § 5102(a)(1). *See* Addendum A (Relevant Excerpts from the Fee Schedule); Insurance Law § 5108. The reimbursement rate compensates service providers based solely on the time that is spent performing each service, the cost of equipment, and other overhead costs. *See* Addendum A at 7, 13, 16, & 19. The Fee Schedule, however, does not account for the cost of paying for patient referrals, and thus forces providers to invent ways in the context of providing care and billing for

that care to recoup the cost of kickbacks.  *See* Letter to Hon. Alice Daniel (Counsel to the Governor) Bill Jacket to L. 1983, c. 577, (recognizing that "kickbacks ... significantly increase the ... costs of health care").   This economic pressure incentivizes providers who pay kickbacks to exploit the patients (who have no individual financial responsibility to the provider) in order to maximize the reimbursement, they can collect from each patient they paid for by providing unnecessary services to patients or treating them according to predetermined protocols.

Mayzenberg faced exactly this sort of pressure.   Mayzenberg paid $562,554.50 in kickbacks in a period of less than two years, a staggering sum, especially when compared to the annual gross receipts reported on Mingmen's tax returns, which ranged from $583,923 to $706,738 during the 2012-2016 tax years (A3153).  Thus, Mayzenberg paid kickbacks equivalent to nearly an entire year of gross annual receipts.[7]  The added cost of kickbacks, which was not covered by the Fee Schedule, necessarily incentivized Mayzenberg to exploit the patients to maximize the services provided to each patient he paid for and the potential reimbursement, regardless of their individualized needs.

---

[7] Depending on the year used as a reference point, Mayzenberg paid anywhere from 79.5% to 96.3% of an entire year of gross annual receipts in kickbacks.

Mayzenberg's testimony confirms that he did just that. Mayzenberg admitted that he would continue to administer acupuncture to a patient for as long as they continued to return to his clinic (A351), a surprising admission since an acupuncturist exercising independent professional judgment should decide how long a patient requires treatment.

GEICO's expert, Steven Schram, Ph.D., D.C., L.Ac., detailed the strategizes Mayzenberg used to recoup the costs of kickbacks. Dr. Schram concluded based on a review of the treatment and billing records that Defendants treated patients according "to a predetermined protocol designed to render medically unnecessary care in order to maximize profit, without regard to the genuine needs of the patient[,]" without "any individual treatment strategy, without any necessary adjustments to treatment as the patient progressed over time, and without any meaningful genuine, and individualized documentation" (A3186). Further, "in virtually every case—the results of Defendants' acupuncture examinations of the patients are fabricated and exaggerated" (A3186). Dr. Schram supported these conclusions with a detailed analysis and case-specific examples. (A3187-A3197). Dr. Schram's analysis illustrates the precise harm New York sought to prevent when it enacted 11 N.Y.C.R.R. § 65-3.16(a)(12) to hold those delivering reimbursable services "to the appropriate professional standards." 2004-40 N.Y. St. Reg. 12, 14 (Oct. 6, 2004) at 14. Thus, the Mayzenberg's kickback scheme exemplifies how

paying kickbacks for patient referrals compromises professional medical judgment, incentivizes ethical violations, and degrades the quality-of-care.

Defendants' interpretation of 11 N.Y.C.R.R. § 65-3.16(a)(12) also produces absurd results with no discernable benefit to the public. According to Defendants, a professional corporation would be ineligible for No-Fault Benefits if a non-professional were a minority owner who received 10% of the corporation's profits because violating Business Corporations Law § 1507 is a "licensing violation." *See* App. Br. at 24. But a professional corporation could be eligible for No-Fault Benefits if it paid that sum to the very same non-professional, so long as the payment came in the form of kickbacks for patient referrals, rather than distributions of profit. Defendants do not justify this disparate outcome and for good reason. No justification exists for treating two professional corporations differently under New York law when they both produce the exact same harm the law was designed to prevent: undue interference with a licensed professional's independent judgment.

What's worse, adopting Defendants' version of the law would have grave public policy implications. Fraud is endemic to the No-Fault system, as the New York Court of Appeals routinely observes. *Matter of Med. Socy. of State v Serio*, 100 N.Y.2d 854, 861 (2003) (recognizing that in 2000 "No-fault fraud accounted for…more than 55% of the 22,247 reports involving all types of insurance fraud"); *Perl v. Meher*, 18 N.Y.3d 208, 214 (2011) (recognizing that "no-fault abuse still

abounds today"). Since 2003, the crisis has only worsened. In 2021, the New York Department of Financial Services ("DFS") found that "no-fault fraud reports accounted for 68% of *all* [the 34,201] fraud reports" received by DFS. *See* New York State, Department of Financial Services 2021 Annual Report on Investigating and Combating Health Insurance Fraud at 4 (emphasis added).[8]

Despite the ongoing crisis, Defendants urge this Court to carve out an exception to 11 N.Y.C.R.R. § 65-3.16(a)(12) to create a safe harbor for them to collect No-Fault Benefits while paying unlawful kickbacks. Such an exception would provide a roadmap for the many non-professionals attempting to influence the operation of professional corporations to maximize profits at the expense of patient safety.[9] With Defendants' proposed safe harbor, any non-professional engaged in a *Mallela/Carothers*-type operation could simply shift their strategy away from siphoning a medical corporation's profits through exorbitant prices for renting MRI equipment and fax machines (*see Carothers*, 33 N.Y.3d at 406), and

---

[8] This report is publicly available at:
https://www.dfs.ny.gov/system/files/documents/2022/03/2021_health_fraud_annual_rpt_20220303.pdf.

[9] Patient referral/brokering schemes are widespread in New York, as illustrated by the recent pleas/convictions by Sady Ribeiro, M.D. and Andrew Dowd, M.D. *See* U.S. Attorney's Office, Press releases, March 23, 2023 and April 25, 2023, *available at https://www.justice.gov/usao-sdny/pr/new-york-lawyers-and-doctor-sentenced-defrauding-new-york-city-area-businesses-and* and https://www.justice.gov/usao-sdny/pr/new-york-doctor-who-performed-unnecessary-back-surgeries-part-trip-and-fall-fraud (last visited June 16, 2023).

towards siphoning a medical corporation's profits through exorbitant prices for patient referrals, even though both scenarios create the same pernicious effect on professional judgment, ethics standards, and patient safety. This Court should decline Defendants' invitation and interpret 11 N.Y.C.R.R. § 65-3.16(a)(12) as it is written.

### 2. GEICO Need Not Trace Each Kickback To A Specific Patient

In the alternative, Defendants argue that even if paying kickbacks for patient referrals could make a medical services provider ineligible for No-Fault Benefits, Defendants remain eligible because GEICO was unable to connect the kickbacks to specific patients. *See* App. Br. at 26. This argument is unsupported by any authority and adopting Defendants' version of the law would defeat the purpose of 11 N.Y.C.R.R. § 65-3.16(a)(12).

Defendants cite no authority to support their contention that an insurer must attribute kickbacks made to specific patients to prove that a provider is ineligible for No-Fault Benefits. The text of New York's anti-kickback laws do not contain any language suggesting that kickbacks need be traced to specific patients to qualify as misconduct that can result in revocation of a professional's license. *See* New York Education Law § 6530(18); 8 N.Y.C.R.R. § 29.1(b)(3). Indeed, the text of the statute and the regulation suggest just the opposite – the often-secreted practice of paying for patient referrals may not be traceable on a patient-by-patient basis – by

prohibiting professionals from "directly or *indirectly*" paying kickbacks for patient referrals. *See*; 8 N.Y.C.R.R. § 29.1(b)(3) (emphasis added).

The absence of a tracing requirement is unsurprising. Adopting Defendants' argument would undermine the purpose of 11 N.Y.C.R.R. § 65-3.16(a)(12), which is to promote compliance "with *all applicable laws*" and to "enhance the quality of care provided to eligible injured parties by insuring that those delivering reimbursable services are held to the *appropriate professional standards.*" 2004-40 N.Y. St. Reg. 12, 14 (Oct. 6, 2004) at 14 (emphasis added). Yet Defendants' interpretation allows providers to collect No-Fault Benefits while violating professional standards through kickbacks, so long as they cannot be traced to specific patients.

Furthermore, adopting Defendants' argument would make circumventing § 65-3.16(a)(12) far too easy. For example, an unscrupulous professional could make it impossible for an insurer to attribute a kickback to a specific patient by paying for multiple patient referrals in a single kickback or by paying a regular monthly kickback irrespective of the number of patient referrals.

Mayzenberg used that very tactic here, paying Nina Brouk kickbacks per month, rather than per patient (A424-A425, A2181-2222). This simple work-around makes §65-3.16(a)(12) powerless to prevent widespread, sophisticated kickback schemes. This outcome is, no doubt, Defendants' preference because paying

kickbacks for patient referrals has been the cornerstone of Mayzenberg's business model. For these reasons, the Court should decline Defendants' invitation to interpret § 65-3.16(a)(12) to allow professional corporations to collect No-Fault Benefits while paying kickbacks for patient referrals, so long as they execute their fraudulent scheme carefully enough to prevent anyone from connecting a kickback to a specific patient.

### 3. The Only Reasonable Conclusion From This Record Is That Mayzenberg Paid Kickbacks For Patient Referrals

Defendants argue that, for various reasons, GEICO failed to prove Mayzenberg paid kickbacks for patient referrals. *See* App. Br. at 26-29. The Court should reject these arguments because Defendants mischaracterize the record and attempt to capitalize on ambiguities that they deliberately created to conceal their fraudulent scheme.

For example, Defendants argue that they "submitted proof in the form of documents and an affidavit from Mayzenberg that there were proper advertising and marketing payments" (App. Br. at 27) and that "the Defendants paid Nina Brouk (sic) Advertisement, LLC, Dona Catalina Marketing, LLC, Desiree Reid, and the Dovman entities to market, advertise and promote his practice, all of which are permitted activities." (App. Br. at 28). These statements are demonstrably false.

51

Mayzenberg candidly admitted that he paid Desire Reid kickbacks for patient referrals, as his own testimony makes clear. When asked why he had Sanli pay Desiree Reid for "referring patients," Mayzenberg answered: "Referring patients, but why not?" (A475). Mayzenberg likewise admitted to paying Nina Bruk Advertising (A420-A424) and Dona Catalina Marketing, LLC for patient referrals (A460-A463). Both are medical referral services that charge a fee for entities to appear on their selective listings of health care providers (A1466-A1471). On appeal, Defendants describe their services as marketing and advertising, but failed to identify either company in response to an interrogatory seeking a list of all companies that provided marketing or advertising services to Defendants (A1539).

Further, the "selective listings" offered by these medical referral services violate New York law. *See* N.Y. Pub. Health Law § 4501 (prohibiting for-profit companies from charging for patient referrals); 8 N.Y.C.R.R. § 29.1(b)(3) (prohibiting professionals from paying for patient referrals). The New York Department of Health has warned that selective listings are "tantamount to a *de facto* referral system, and the listing fee charged to the physician is viewed as a tacit referral fee" that violates New York's prohibition on paying for patient referrals (A2225-A2228).

On appeal, Defendants argue that GEICO failed to prove the medical referral services violated the law. *See* App. Br. at 25. Defendants reason that the opinion

letter discussed above allows a referral service to "charge a fee to each physician who wishes to be listed (essentially an advertising fee)" as long as "the listing is available to potential patients for free," and GEICO did not submit any evidence that a patient paid a fee for the exclusive listing. *Id.*

Defendants mischaracterize both the facts and the law. The line quoted from the opinion letter above was tailored to the particular referral service making the request, which indicated that it "would make no specific recommendation to callers" (A2226). The medical referral services here do exactly the opposite. Mayzenberg testified that Nina Bruk Enterprise will "recommend different practitioners" to car accident victims (A421-A422.). Mayzenberg also testified that Dona Catalina "recommends that patients go to a particular location" (A461). Thus, Defendants' contention that the medical referral services are engaged in "permitted activities" fails.

Defendants also argue that "the vast majority of the 1390 patients were seen prior to any payments being made in September 2015 and it was not possible for them to be part of the no-fault scheme." App. Br. at 27. The Court should reject this argument because it seeks to exploit ambiguities Defendants deliberately created.

Defendants did not reduce the terms of their kickback scheme to writing. In fact, they went to enormous lengths to conceal their arrangement with a thicket of

corporate shell companies and payments that started with Mayzenberg and circuitously ended with the Dovmans. It is, thus, by design that the kickbacks cannot be attributed to precise time periods when patients were treated. For this reason, it is impossible – based on Defendants' deceptive conduct, deliberately so – to know whether a kickback was paid for past, present, or future patient referrals. Mayzenberg's arrangement with the medical referral services illustrates an example of payment for future patient referrals, but Defendants also made it impossible to discern whether the Dovman Shell Entities received kickbacks for merely referring patients or for patient referrals that resulted in the actual treatment and collection of No-Fault Benefits.

The lack of clarity on this point is inevitable. Anyone executing a massive unlawful kickback scheme, which could result in the loss of a professional license or criminal charges, can hardly be expected to keep records detailed enough to discern every facet of a kickback scheme.

What's more, Defendants deliberately created this fog of uncertainty not only during the execution of the scheme, but also during the prosecution of this litigation. Igor Dovman and Daniel Corley invoked the Fifth Amendment to avoid any testimony that might have shed light on the details of the kickback scheme. Mayzenberg actively concealed the kickback scheme *during* this litigation. At his *March* 2018 deposition, Mayzenberg denied knowing or even having heard the name

54

Igor Dovman (A235, A249), yet his affidavit states that he communicated in *January* and *March* of 2018 while telephone records show that he communicated with Igor Dovman as early as November 2017 (A2017-A2023, A3139).

Mayzenberg also concealed his connection with Dovman Shell Entities during discovery. When asked in an interrogatory for a list of vendors hired on behalf of his professional corporations, Mayzenberg failed to identify any of the Dovman Shell Entities (A1539).

The Court should not allow Defendants to spend years concealing the details of their fraudulent scheme, only to exploit the absence of those same details once their scheme has been exposed. Defendants committed willful and material licensing violations and are, therefore, ineligible to collect any No-Fault Benefits under New York law. *See* 11 N.Y.C.R.R. § 65-3.16(a)(12).

Finally, Defendants point to Mayzenberg's affidavit as proof that he paid for legitimate marketing and advertising services, not kickbacks. Mayzenberg states: "It was my understanding that the payments which ultimately went to the companies identified by GEICO as the Dovman shell companies were for similar [marketing and advertising] services" (A3138). Statements based on a party's "understanding" are not based on personal knowledge and, therefore, need not be considered. *See Patterson v. County of Oneida*, 375 F.3d 206, 222 (2d Cir. 2004); *see, e.g., Star Ins. Co.*, 2007 WL 316569, at *13. In any event, a party cannot defeat summary

judgment "simply by submitting an affidavit that contradicts the party's previous sworn testimony." *In re Fosamax Prods. Liab. Litig.*, 707 F.3d 189, 193 (2d Cir.), *cert. denied*, 569 U.S. 1026 (2013) (per curiam). Mayzenberg's affidavit that he paid the Dovman entities flatly contradicts his prior sworn interrogatory responses (A1539). Thus, Mayzenberg's affidavit cannot create a factual dispute warranting a trial.

Defendants also argue that the record lacks "a single affidavit from anyone else with first-hand knowledge as to the alleged kickback scheme." *See* App. Br. at 26. Defendants ignore that Daniel Corley, Esq. and Igor Dovman invoked their Fifth Amendment privilege against self-incrimination instead of answering a single substantive question. Thus, the "lack of testimony from [Dovman and Corley mean[s] that there [is] no record evidence to dispute [GEICO's] overwhelming evidence" of a kickback scheme. *See In re 650 Fifth Ave. & Related Properties*, 830 F.3d 66, 93 (2d Cir. 2016). Thus, Defendants caused a lack of evidence from those with "first-hand knowledge" (App. Br. at 26), and they "must bear the consequence[s]" of that choice. *United States v. Certain Real Prop. & Premises Known as 4003-4005 5th Ave., Brooklyn, N.Y.*, 55 F.3d 78, 83 (2d Cir. 1995).

## POINT II

### THE DISTRICT COURT PROPERLY GRANTED GEICO SUMMARY JUDGMENT ON ITS' CLAIM UNDER 18 U.S.C. § 1962(c) AND ENTERED A JUDGMENT AGAINST MAYZENBERG FOR $2,835,489.72

### A. General Legal Principles

To establish a claim for a civil violation of § 1962(c), a plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 520 (2d Cir. 1994) (internal quotations omitted); *see also DeFalco v. Bernas*, 244 F.3d 286, 306-307 (2d Cir.), *cert. denied*, 534 U.S. 891 (2001). In this context, "racketeering activity" consists of specific enumerated crimes, including mail fraud in violation of 18 U.S.C. §1341. *See* 18 U.S.C. § 1961(1)(B).

### B. GEICO Established All Elements Of A Section 1962(C) Violation

Against this backdrop, GEICO established all the elements of its' RICO claim against Mayzenberg under §1962(c). GEICO established the existence of an enterprise, considering that 18 U.S.C. § 1961(4) defines "enterprise" to include corporate entities, and Defendants admitted that Mingmen – the alleged racketeering enterprise – is an acupuncture professional corporation owned by Mayzenberg (A38,

57

A94, A96, A98, A1540, A3136, A3213). *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163-64 (2001).

GEICO further established that Mayzenberg "participated" in the Mingmen racketeering enterprise and did so in a manner sufficient to support RICO liability. For example, Mayzenberg admitted to being the president, sole officer, and sole owner of Mingmen, and solely responsible for Mingmen's financial operations and, along with his wife, responsible for No-Fault insurance billing (A39, A81-A83). This was more than sufficient to demonstrate Mayzenberg's participation in the Mingmen enterprise, considering that a defendant's participation in a racketeering enterprise only requires proof that defendant played some part in the operation of the enterprise, even if not the predominant one. *See, e.g.*, *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (explaining that the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs). GEICO also established that Mayzenberg engaged in a pattern of racketeering activity through Mingmen by demonstrating that Mayzenberg caused thousands of fraudulent bills to be submitted through Mingmen to GEICO <u>via</u> the United States mail over the course of more than five (5) years. Therefore, Mayzenberg engaged in a closed-ended pattern of predicate acts of mail fraud under 18 U.S.C. §1341. *Metromedia Co. v. Fugazy*, 983 F.2d 350, 369 (2d Cir. 1992), *cert.*

*denied*, 508 U.S. 952 (1993). Thus, the District Court properly entered a judgment against Mayzenberg on this claim.

## C. **Defendants' Arguments On Appeal Lack Merit**

On appeal, Defendants make a single-sentence challenge to the judgment on the RICO claim, contending that "There is not one GEICO patient for which it can be said the mailing of the bill constitutes the predicate act of mail fraud based on the patient having been obtained by way of an illegal kick-back (sic), as discussed above." App. Br. at 34.

However, GEICO need not trace each kickback to a specific patient to obtain summary judgment against a healthcare provider that pays kickbacks in exchange for patient referrals. Rather, as courts have steadily and consistently held, a healthcare provider that pays or receives unlawful kickbacks in exchange for patient referrals operates in violation of New York State healthcare licensing requirements, and therefore lacks <u>any</u> entitlement to collect No-Fault Benefits in connection with <u>any</u> of its claims. *See, e.g., Carothers, supra*; *Metro Pain Specialists P.C., supra*; *Landow, supra*; *Elmwood Park Med. Grp., supra*; *Relief Med., P.C., supra*; *Zilberman, supra*; *Zaitsev, supra*; *Cean, supra*; *Erlikh, supra*; *Jacques, supra*; *Badia, supra*; *Alrof, supra; see also* 11 N.Y.C.R.R. § 65-3.16(a)(12), *Mallela, supra*.

Courts have reached this conclusion for good reason. Considering that fraudulent healthcare providers typically conceal their unlawful activities from the

licensing authorities and procure what appear to be facially-valid healthcare licenses through such acts of fraud and concealment, the New York Court of Appeals has specified that insurers "may look beyond the face of licensing documents to identify willful and material failure to abide by state and local law." *Mallela*, *supra*.

GEICO demonstrated here that Defendants paid massive amounts of unlawful kickbacks in exchange for patient referrals, thereby divesting them of <u>any</u> right to collect No-Fault Benefits in connection with any of their claims. Even so, the record in this action demonstrates that through a years-long pattern of predicate acts of mail fraud, Mayzenberg submitted a large amount of No-Fault billing through Mingmen to GEICO, in which he systematically falsely represented (among other facts) that Mingmen had complied with applicable licensing laws and was eligible to collect No-Fault Benefits, when in fact it was not.

Thus, GEICO was entitled to recover treble damages (*see* 18 U.S.C. §1964(c)) and was properly awarded judgment in the amount of $2,835,489.72 against Mayzenberg, Sanli, Laogong and the Dovmans, representing three times the actual amount that GEICO paid in reliance on the fraudulent and unlawful No-Fault billing submitted or caused to be submitted through Mingmen. *See Allstate Ins. Co. v. Howell*, 2013 WL 5447152 (E.D.N.Y. Sep't 27, 2013).

## POINT III

## THE DISTRICT COURT PROPERLY GRANTED GEICO SUMMARY JUDGMENT ON ITS FRAUD CLAIM AND ENTERED A JUDGMENT AGAINST MAYZENBERG FOR $945,163.24

### A.  General Legal Principles

A claim for common law fraud in New York requires facts demonstrating: (i) a material misrepresentation or omission of fact; (ii) made with knowledge of its falsity (i.e., scienter); (iii) reasonable reliance on the part of the plaintiff; and (iv) damages caused by the misrepresentation or omission.  *See Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997).  To establish an intent to deceive, a party must establish a defendant's guilty knowledge or willful ignorance." *Schwartz v. Newsweek, Inc.*, 653 F. Supp. 384, 390 (S.D.N.Y. 1986), *aff'd*, 827 F.2d 879 (2d Cir. 1987) (internal quotations omitted). "[B]ecause fraudulent intent is rarely susceptible to direct proof, it may ordinarily be established by circumstantial evidence and the legitimate inferences arising therefrom."  Id. (internal quotations omitted).  Therefore, "fraudulent intent can be established where a plaintiff provides evidence that support[s] a 'strong inference that the defendants possessed the requisite fraudulent intent.'"  *Enzo Biochem, Inc. v. Johnson & Johnson*, No. 87 Civ. 6125 (KMW), 1992 WL 309613, at *11 (S.D.N.Y. Oct. 15, 1992) (*quoting Cosmas v. Hassett*, 886 F.2d 8, 12-13 (2d Cir. 1989)).  "Such an inference may be shown, for

61

example, by establishing a motive to defraud or by identifying conscious behavior by the accused party." *Id.* (internal quotation omitted).

**B.    The District Court Properly Entered Judgment Against Mayzenberg On GEICO's Fraud Claim**

GEICO established that Defendants made actual misrepresentations about their eligibility to collect No-Fault Benefits and that they did so with the requisite intent. For example, Mayzenberg had a strong financial motive to conceal the disqualifying kickback scheme in which he and the other Defendants were engaged, because he knew that any discovery of the scheme would preclude them from recovering millions of dollars in ill-gotten No-Fault Benefits. *See, e.g., Shields v. Citytrust Bancorp*, 25 F.3d 1124, 1130 (2d Cir. 1994).

GEICO also identified "conscious behavior" on Mayzenberg's part that established his fraudulent intent.  For instance, rather than making the illegal kickback payments to the Dovman Shell Entities, Corley, the Medical Referral Sources, and Desiree Reid directly from Mingmen – on whose behalf these payments were made – Mayzenberg concealed the payments through his use of the Sanli and Laogong accounts.

Finally, GEICO reasonably relied on Defendants' fraudulent misrepresentations that Mingmen was eligible to receive No-Fault Benefits.  GEICO could not have learned of Defendants' heavily-concealed kickback scheme – carried out through a constellation of shell entities – because the scheme was "peculiarly

within the defendant[s]' knowledge." *Cf. LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, 10 F. Supp. 3d 504, 517 (S.D.N.Y. 2014) ("Internal proceedings and matters of intent can qualify as peculiar knowledge even when they relate to matters of public record"). In any event, insurers are entitled to rely on the representations made to them by healthcare providers seeking reimbursement on no-fault insurance claims. *See, e.g., Allstate Ins. Co. v. Lyons*, 843 F. Supp. 2d 358, 375 (E.D.N.Y. 2012) ("Allstate was entitled to rely on the representations that defendants made to it...."); *see also Variety Homes, Inc. v. Postal Life Ins. Co.*, 287 F.2d 320, 323 (2d Cir. 1961)(in general, an insurer is entitled to rely on the representations of its insureds, and is not required to investigate the truthfulness of the representations).

## C. <u>Defendants' Arguments On Appeal Should Be Rejected</u>

Defendants' only argument on appeal is that "there is no evidence of any material misrepresentation, an intent to defraud or reliance by GEICO." *See* App. Br. at 34. According to Defendants, "the Court cannot conclude that the Defendants defrauded GEICO out of any money as GEICO cannot demonstrate that it could have successfully withheld payment of the 1390 patients' claims (including the 2011 to 2015 claims) based on the payments made to the alleged shell companies between September 2015 and 2017." *See* App. Br. at 34-35.

As discussed above, however, the law is clear that a healthcare provider that pays unlawful compensation in exchange for patient referrals operates in violation

of state licensing laws and therefore has no right to collect No-Fault Benefits in connection with <u>any</u> of its claims. New York law simply does not recognize a "partially fraudulent" healthcare provider or permit a fraudulently-licensed healthcare provider to recover on any of its claims. The Court should not allow Defendants to spend years concealing the details of their fraudulent scheme, only to exploit the absence of those same details once their scheme has been exposed. In any event, Mayzenberg began transferring funds from Mingmen, to himself, and then to the inactive entities - Sanli and Laogong - as early as 2012 (A2248-A2249).

Also, the record is replete with evidence of Mayzenberg's material misrepresentations, his intent to defraud, and GEICO's reliance. *See* Points I.C. and III.B. Mayzenberg always paid kickbacks through Sanli or Laogong and never through Mingmen (A41, A64, A1657-1815, A2180-A2224). He also made repeated misrepresentations during discovery to hide any connection with the Dovmans (A235, A249, A1539, A1541, A2017-A2023, A3139).

At bottom, Mingmen never was entitled to receive No-Fault Benefits from GEICO or other insurers, because it operated in pervasive violation of New York State licensing requirements. Even so, Defendants submitted an enormous amount of fraudulent and unlawful No-Fault billing through Mingmen to GEICO, all of which falsely represented that Mingmen was eligible to collect on the billing in the first instance. GEICO was entitled to rely on this billing, reasonably relied on the

representations in the billing, and as a result paid $945,163.24 in No-Fault Benefits. Against this backdrop, the District Court properly entered summary judgment for GEICO on its fraud claim.

## **<u>CONCLUSION</u>**

For the reasons stated herein, this Court should affirm, with costs, and grant

GEICO such other and further relief as to the Court may seem just and proper.

Dated: June 27, 2023

RIVKIN RADLER LLP

By:_____
      Barry I. Levy, Esq.
      Michael A. Sirignano, Esq.
      Henry M. Mascia, Esq.
      Steven T. Henesey, Esq.
      926 RXR Plaza
      Uniondale, New York 11556
      (516) 357-3000

*Counsel for Plaintiffs-Appellees, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company*

## <u>CERTIFICATE OF COMPLIANCE WITH FRAP 32(a)</u>

This brief complies with the type-volume limitation of Fed. R. App. P. Rule 32(g)(1) because this brief contains 13,710 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft© Word in Times New Roman, 14 point font.